# United States Court of Appeals for the Federal Circuit

**BASF CORPORATION,**

*Plaintiff-Appellant,*

— v. —

**UNITED STATES,**

*Defendant-Appellee.*

*On Appeal from the United States Court of International Trade in No. 1:12-cv-00422, Honorable Lisa Wen-Jia Wang*

## PRINCIPAL BRIEF FOR
## PLAINTIFF-APPELLANT BASF CORPORATION

FREDERIC D. VAN ARNAM, JR.
ASHLEY J. BODDEN
BARNES, RICHARDSON
  & COLBURN LLP
45 Broadway, Suite 3130
New York, New York 10038
(212) 725-0200
rvanarnam@barnesrichardson.com
abodden@barnesrichardson.com

*Counsel for Plaintiff-Appellant*

JANUARY 14, 2026

 COUNSEL PRESS    (800) 4-APPEAL • (389426)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 26-1056 |
| **Short Case Caption** | BASF Corporation v. US |
| **Filing Party/Entity** | BASF Corporation, Plaintiff-Appellant |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/27/2025

Signature: *Frederic D. Van Arnam*

Name: Frederic D. Van Arnam, Jr.

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| BASF Corporation | | BASF SE |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable ☐  Additional pages attached

| | | |
|---|---|---|
| Ashley Bodden<br>Barnes, Richardson & Colburn, LLP | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below) ☑  No ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS ........................................................... i

TABLE OF AUTHORITIES ...................................................iv

STATEMENT OF RELATED CASES .................................. viii

STATEMENT OF JURISDICTION....................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE .............................................................5

STATEMENT OF THE FACTS ..........................................................11

SUMMARY OF ARGUMENT ...............................................................22

ARGUMENT ...........................................................................................28

    I.     Standard of Review ...........................................................28

    II.    Previous Beta Carotene Litigations .....................................30

    III.   Betatene is Provided for *Eo Nomine* in Heading 2936 And Chapter 29, Note 1(f)....................................................36

IV    The Trial Court Misapplied the Holding in Roche Vitamins as Neither the Stabilizing Ingredients Nor the Processing they Undergo Render the Beta Carotene Particularly Suitable for Specific Use Rather than General Use ........................................................................41

    A.    Having Found that the Stabilizer Ingredients and Manufacturing Process Did Not Alter the Character of the Beta Carotene in Betatene, the CIT Erred by Continuing its Analysis of the Specific Use Criterion...............44

    B.    Neither the Stabilizer Ingredients Nor the Process by Which the Stabilizer is Created Altered the Character of the Beta Carotene to Render it a Specific Use Product......................48

        1.    Both Betatene and BetaTab are Made by the Microencapsulation Process................54

        2.    The Fact that Betatene is Used as a Provitamin Ingredient in Vitamin and Supplement Tablets and Capsules Does Not Make it Particularly Suitable for a Specific Use......................................58

    C.    The Stabilizing Ingredients and the Process Do Not Alter the Character of the Beta Carotene From that of General Use....................................60

V.  Betatene is Excluded from Heading 2106 Because it is Classified in Heading 2936..........................69

CONCLUSION ......................................................................72

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                             **Page**

*Alcan Food Packaging (Shelbyville) v. United States,*
771 F.3d 1364 (Fed. Cir. 2014)............................................................29

*Apple Inc. v. United States,*
964 F.3d 1087 (Fed. Cir. 2016)............................................................41

*BASF Corp. v. United States,*
482 F.3d 1324 (Fed. Cir. 2007)......................................................*passim*

*BASF Corp. v. United States,*
391 F. Supp.2d 1246 (Ct. Int'l Trade 2005) ....................................31,57

*BASF Corp. v. United States,*
798 F. Supp.2d 1353 (Ct. Int'l Trade 2011) ........................................32

*Bausch & Lomb, Inc. v. United States,*
148 F. 3d 1363 (Fed. Cir. 1998) .....................................................28

*Blue Sky the Color of Imagination, LLC v. United States,*
160 F.4 1334, 2025 U.S. App. LEXIS 31531 (Fed. Cir. 2025) .............53

*Carl Zeiss, Inc. v. United States,*
195 F.3d 1375 (Fed. Cir. 1999)............................................................37

*Del Monte Corp. v. United States,*
730 F.3d 1352 (Fed. Cir. 2013)............................................................39

*Dependable Packaging Solutions, Inc. v. United States,*
757 F. 3d 1374 (Fed. Cir. 2014)............................................................29

*EM Indus., Inc. v. United States,* 22 CIT 156,
999 F. Supp. 1473 (1998) ..........................................................30, 69

iv

*GE-Med. Sys. Group v. United States*,
247 F.3d 1231 (Fed. Cir. 2001)............................................................36

*Home Depot U.S.A., Inc. v. United States*,
491 F.3d 1334 (Fed. Cir. 2007)............................................................28

*Kahrs Int'l, Inc. v. United States*,
713 F.3d 640 (Fed. Cir. 2013)............................................................29

*Mita Copystar Am. v. United States*,
21 F.3d 1079 (Fed. Cir. 1994)............................................................70

*Nidec Corp. v. United States*,
68 F.3d 1333 (Fed. Cir. 1995)............................................................36

*Orlando Food Corp. v. United States,* 140 F.3d 1437,
(Fed. Cir. 1998)............................................................ 28

*Roche Vitamin, Inc. v. United States*,
772 F.3d 728 (Fed. Cir. 2014)........................................*passim*

*Roche Vitamins, Inc. v. United States*,
922 F. Supp.2d 1353 (Ct. Int'l Trade 2013) ................................*passim*

*Roche Vitamins, Inc. v. United States*,
750 F. Supp.2d 1367 (Ct. Int'l Trade 2010) ................................*passim*

*Rollerblade, Inc. v. United States*,
282 F.3d 1349 (Fed. Cir. 2002)................................................30, 69, 70

*Rubie's Costume Co. v. United States*,
337 F.3d 1350 (Fed. Cir. 2003)............................................................41

*Sigma-Tau HealthScience, Inc. v. United States*,
838 F.3d 1272 (Fed. Cir. 2016)........................................8,36,39, 40, 41

# STATUTES AND REGULATIONS

28 U.S.C. § 1581(a) ............................................................ 2

28 U.S.C. § 1295(a)(5) ..................................................... 2

General Rule of Interpretation 1 ....................................... *passim*

Heading 2106 .................................................................... *passim*

Subheading 2106.90.99 ............................................ 3, 5, 6, 7, 69

Chapter 29 Note l ........................................................... *passim*

Chapter 29 Note l(e) ........................................................ 42

Chapter 29 Note l(f) ...................................................... *passim*

Chapter 29 Note l(g) ........................................................ 43

Heading 2936 .................................................................... *passim*

Subheading 2936.90.01 ..................................... *passim*

Subheading 2936.10.00 ..................................... 31, 33,

Subheading 3204.19.35 ..................................... 32

Subheading 3204.18.00 ..................................... 33

Federal Rules of Appellate Procedure 28(a) ............................... 1

Federal Rules of Appellate Procedure 32(a) ............................... 1

Federal Rules of Appellate Procedure 4(a)(1)(B) ........................ 2

Rules of Practice of the U.S. Court of Appeals for the
Federal Circuit 28(a) .................................................... 1

Rules of Practice of the U.S. Court of Appeals for the Federal Circuit 32(a) ...................................................... 1

Rules of Practice of the U.S. Court of Appeals for the Federal Circuit 47.5....................................................... 2

## OTHER AUTHORITIES

Explanatory Notes to the Harmonized Commodity Description and Coding System, Note 29.36 ...................... *passim*

Explanatory Notes to the Harmonized Commodity Description and Coding System, Note 21.06 ................................70

*Random House Webster's Unabridged Dictionary*, p. 1557 (2nd Ed. 1998) ..............................................................11

ZN.Madhavi, Ch. Sai Shivani Reddy, V.T. Iswariya, K. Mary Swarnalatha, & A. Harshika, *Microspheres and Micro Capsules: A Concised Review*, 20 Neuro Quantology, 2517 (2022). .........................54

# STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of Practice of the United States Court of Appeals for the Federal Circuit, counsel for plaintiff-appellant BASF Corporation makes the following statements:

(1) No other appeal in or from the same civil action or proceeding in the trial court was before this or any other appellate court.

(2) Counsel for Plaintiff-Appellant is unaware of any other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

No. 2026-1056

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

BASF CORPORATION,

*Plaintiff-Appellant,*

*-v.-*

UNITED STATES,

*Defendant-Appellee.*

_____

## APPEAL FROM THE UNITED STATES COURT OF
## INTERNATIONAL TRADE, COURT NO. 1:12-cv-00422
## JUDGE LISA W. WANG

## PRINCIPAL BRIEF FOR PLAINTIFF - APPELLANT,
## BASF CORPORATION

Plaintiff-Appellant, BASF Corporation, in accordance with Rules 28(a) and 32(a) of the Federal Rules of Appellate Procedure and the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, hereby submits its principal brief in this appeal.

# STATEMENT OF JURISDICTION

Pursuant to 28 U.S.C. §1581(a), the civil action giving rise to this appeal was commenced in the United States Court of International Trade. An opinion was published, and a judgment was entered on August 13, 2025.

This appeal is filed pursuant to 28 U.S.C. §1295(a)(5), which grants the United States Court of Appeals for the Federal Circuit exclusive jurisdiction over appeals from final decisions of the Court of International Trade. This is an appeal from a final judgment that disposes of all parties' claims.

A notice of appeal was filed on October 10, 2025, within the time prescribed in Fed. R. App. P. 4(a)(1)(B). The appeal was docketed on October 15, 2025.

# STATEMENT OF THE ISSUES

1.     Applying Rule 1 of the General Rules of Interpretation of the Harmonized Tariff Schedule of the United States ("HTSUS"), the *eo nomine* tariff heading 2936 HTSUS, Chapter 29, Note 1(f) HTSUS, and the residual tariff heading 2106 HTSUS, did the U.S. Court of International Trade err in classifying Betatene® 7.5% N, a beta carotene (i.e., provitamin A) formulation stabilized for preservation or transport, in subheading 2106.90.99 (HTSUS) as "[f]ood preparation not elsewhere specified or included: [o]ther: [o]ther" instead of in subheading 2936.90.01 (HTSUS) as a '[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . .: [o]ther, including provitamins and natural concentrates"?

2.     Did the U.S. Court of International Trade misconstrue the plain meaning of note 29.36 of the *Explanatory Notes to the Harmonized Commodity Description and Coding System ("EN")* by delinking the first requirement that the stabilizing ingredients or processing alter the character of the provitamin or vitamin as a predicate for the second requirement that the change or alteration render the provitamin or

vitamin particularly suitable for specific rather than general use? Does *EN 29.36* mean that if the character of the provitamin or vitamin is not changed, then the first half of the joint condition is not met so that no alteration exists that renders the provitamin or vitamin particularly suitable for specific rather than general use?

3.    Did the U.S. Court of International Trade err by not following the criteria analyzed by the Federal Circuit in *Roche Vitamin, Inc. v. United States*, 772 F.3d 728 (Fed. Cir. 2014), for determining when the ingredients or processing utilized to stabilize beta carotene for preservation or transport go beyond that purpose and render the beta carotene particularly suitable for a specific use as vitamin or supplement tablets?

4.    Did the U.S. Court of International Trade err by not following the criteria analyzed by the Federal Circuit in *Roche Vitamin, Inc. v. United States*, 772 F.3d 728 (Fed. Cir. 2014), for determining when the ingredients or processing utilized to stabilize beta carotene for preservation or transport had actually rendered the beta carotene

particularly unsuitable for general use as provitamin A in applications other than vitamin or supplement tablets?

**STATEMENT OF THE CASE**

This is an appeal from the U.S. Court of International Trade's (hereafter "CIT") denial of Plaintiff-Appellant's, BASF Corporation, (hereafter "BASF"), motion for summary judgment, and the grant of summary judgment to Defendant-Appellee the United States (hereafter the "United States"). The imported merchandise at issue is Betatene® 7.5% N, (hereafter "Betatene") which is a beta carotene formulation consisting of a beta carotene carotenoid mixture (hereafter 'beta carotene") derived from the alga *Dunaliella salina*, dissolved in soybean oil and enrobed in a protective matrix of gelatin and sucrose, with ascorbyl palmitate and tocopherols as antioxidants, and with silicon dioxide as an anti-caking agent and flow aid. Appx357, Appx987.

In 2011 and 2012, the United States Customs and Border Protection (hereafter "Customs" or "CBP") liquidated entries of Betatene under subheading 2106.90.99 as "food preparations not elsewhere specified or included: [o]ther: [o]ther. Appx357, Appx987. Goods classified

under subheading 2106.90.99 were dutiable at 6.4 percent, *ad valorem*. BASF filed timely protests of this classification, arguing that Betatene was classifiable under subheading 2936.90.01 as "[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . . : [o]ther, including provitamins and natural concentrates." Customs denied the protests.

Thereafter, BASF challenged the denials of its protests and the classification of the Betatene under subheading 2106.90.99 by bringing a timely action at the CIT. After discovery, BASF moved for summary judgment, seeking reclassification of Betatene under subheading 2936.90.01 as a provitamin. The United States cross-moved for summary judgment, seeking judgment sustaining the denied protest. The matter was originally before Judge Richard K. Eaton, but on March 27, 2024, the matter was reassigned to Judge Lisa W. Wang. Appx029.

Judge Wang issued her decision on August 13, 2025,[1] holding that

_____

[1] Judge Wang's original opinion and order was issued under seal, with the Judge requesting on August 13, 2025, that the parties review it and advise if anything in the opinion needed to be treated confidentially. Appx031-032. The parties advised her in writing on August 28, 2025, that nothing in the opinion and order was considered confidential by either

the imported Betatene was classifiable under subheading 2106.90.99 as "food preparations not elsewhere specified or included: [o]ther: [o]ther," a residual, "basket" provision covering goods not provided for elsewhere in the tariff, rather than as a provitamin of subheading 2936.990.01. Appx022.

Judge Wang acknowledged that no dispute existed regarding the "meaning of the terms of heading 2936 and the nature of Betatene." In turn, Judge Wang characterized the issue before her as:

> the proper classification of Betatene turns on whether it satisfies the limitations of note 1(f) to chapter 29, and EN 29.36, i.e. to be classifiable as a provitamin under heading 2936:
>
> 1. Betatene must not have more stabilizers than necessary for preservation or transport;
>
> 2. The addition of stabilizer ingredients and the manufacturing process must not alter the character of Betatene as a beta carotene product; and
>
> 3. The addition of stabilizer ingredients and the manufacturing process must not render the Betatene particularly suitable for specific use rather than for general use.

party. Appx032. Thereafter, the public version of the decision was released on September 5, 2025. Appx032. All references in this memorandum are to the public version of the opinion and order.

Appx012-013. The first point reflects the legal requirement set out in Chapter 29, Note 1(f) of the HTSUS, while the second and third points mirror language set out in the *Explanatory Notes to the Harmonized Commodity Description and Coding System*, (hereafter the "*ENs*"), the non-binding interpretative guide used to help understand the scope of unclear HTSUS headings and notes. *See, Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1281 (Fed. Cir. 2016).

On the first point, Judge Wang found that the parties agreed that "stabilization is necessary for a beta carotene product to be commercially viable, regardless of the amount of beta carotene in the formulation," and that BASF had provided unrefuted evidence that Betatene was formulated using the minimum ingredients necessary for preservation or transport of the beta carotene in the product. Appx013-014. Judge Wang concluded that "the quantities of stabilizing ingredients added to Betatene satisfy the limitations explained in note 1(f) to chapter 29." Appx014.

On the second point, Judge Wang found that Betatene's formulation and its manufacturing process "did not alter the character of

the beta carotene or Betatene's ability to function as provitamin A." Appx016. The court highlighted the uncontested facts and the agreement among the parties' experts establishing that the formulation of Betatene, using the stabilizing ingredients, did not chemically modify or alter the chemical structure of the beta carotene in Betatene or its inherent character as provitamin A. Appx015-016. The beta carotene remained provitamin A, notwithstanding it being formulated with the other inert ingredients to stabilize it. The court concluded that "[t]he addition of stabilizer ingredients and Betatene's manufacturing process satisfies the first limitation of EN 29.36 . . .." Appx016.

On the third point, however, Judge Wang found that the ingredients and processing rendered it particularly suitable for tableting "in a manner which is distinguishable from the product in [*Roche Vitamin, Inc. v. United States*, 772 F.3d 728 (Fed. Cir. 2014)]." Appx017. The court focused on the testimony and evidence showing that the Betatene formulation optimized the product for use as provitamin A in tablets and hard capsule forms, and concluded that the ingredients and processing, "particularly the process of microencapsulation," rendered it

a specific use product because it had been optimized for use post importation in vitamin supplement tablets. Appx017.

The court also concluded that the beta carotene in Betatene had been processed to a point where it was now not suitable for general use. While not defining what constituted the general use of stabilized provitamin A, the court concluded that the "record evidence establishes that Betatene is not suitable for general use after microencapsulation." Appx020. The court concluded that Betatene's suitability for uses after importation in vitamin forms other than tableting (such as beverages, capsules, gummies, functional foods, etc.) required it to be de-formulated, which was not commercially or functionally viable. Appx020.

The court then reviewed heading 2106 and held that Betatene was a food preparation for tariff purposes and classified it under that heading. The court entered judgment for the defendant United States upholding the contested classification.

## STATEMENT OF FACTS

Betatene consists of a dark red powder made up of very fine individually microencapsulated beadlets that are approximately 240 to 300 microns in size. Each beadlet consists of a beta carotene, derived from the alga *Dunaliella salina,* dissolved in soybean oil and enrobed in a protective matrix of gelatin and sucrose, with ascorbyl palmitate and tocopherols as antioxidants, and with silicon dioxide as an anti-caking agent and flow aid. Appx357, Appx366, Appx987, Appx989.

Beta carotene is the active ingredient in Betatene, with the other ingredients in the formulation present to stabilize and preserve the beta carotene. Appx359, Appx360, Appx988. By its very nature, beta carotene is both organic coloring matter and provitamin A.[2] Appx358, Appx987, Appx988. It is highly sensitive, and it must be formulated and stabilized to protect it against oxygen, moisture, sunlight, and stresses that would cause the beta carotene to degrade and to lose its ability to color and to

_____

[2] A provitamin is a substance which is converted into a vitamin within an organism. *See* "Provitamin," *Random House Webster's Unabridged Dictionary*, p. 1557 (2nd Ed. 1998) ("a substance that an organism can transform into a vitamin, as carotene, which is converted to vitamin A in the liver").

be provitamin A. Appx359, Appx988. It is pyrogenic if not stabilized. Appx359, Appx988. Also, beta carotene is insoluble in water and thus must be formulated before it can become bioavailable to humans or so it can impart color to foodstuffs. Appx358, Appx359, Appx988.

Companies like BASF overcome these challenges by creating formulations of beta carotene, which formulations are mixtures of the active ingredient beta carotene with other inactive ingredients. Appx359, Appx360, Appx988. In these mixtures, the inactive ingredients serve to carry, stabilize, protect and preserve the beta carotene, thus allowing for safe handling, storage and transportation and ensuring the bioavailability of the provitamin A and its color strength in end use applications. Appx359, Appx360, Appx988. A "stabilizing matrix of some kind is necessary for any beta carotene product, and beta carotene must be processed and combined with other ingredients to be commercially usable as either a provitamin A or colorant." *Roche Vitamin, Inc. v. United States*, 772 F.3d 728, 730 (Fed. Cir. 2014) (*Roche Vitamins III*), citing *Roche Vitamins, Inc. v. United States*, 922 F. Supp.2d 1353, 1362 (Ct. Int'l Trade 2013) (*Roche Vitamins II*).

BASF imports Betatene in bulk form. Thereafter, it sells Betatene to companies that primarily use it as a source of provitamin A in human dietary supplement forms such as tablet and hard capsule, Appx367, Appx991, though nothing about Betatene's formulation prevents it from being used as a source of provitamin A in different dietary supplement forms. Appx367, Appx990, Appx991.

A.   *The Role of the Ingredients in Betatene*

The ingredients used in the Betatene were chosen by BASF to work together to carry, stabilize and preserve the beta carotene by protecting it from oxidation and degradation caused by temperature, moisture, humidity, ultraviolet rays, and stress. Appx360, Appx988. As described below, the formulation ingredients come together via the formulation process to create **beadlets** that stabilize the oily droplets of beta carotene particles in a matrix of gelatin and sucrose, with antioxidants present to add additional stability and preservation. Appx361, Appx362, Appx364, Appx365, Appx988, Appx989. During the development of a beta carotene formulation such as Betatene, the stability of the formulation as a bulk product and in end-use applications is tested. The composition,

percentage and cost of ingredients is changed until satisfactory stability is achieved. Thus, these processing ingredients are present in amounts no more than necessary to accomplish this goal. Appx014. If the formula was altered, or an ingredient removed, then the stability of the beta carotene would be compromised.

The ingredients used in Betatene are as follows:

1. *Beta carotene*

Beta carotene is the active ingredient in Betatene. Appx359, Appx988. It contains a natural mix of trans- and cis- beta carotene and a small amount of its isomer alpha-carotene. Appx360, Appx988. It is the provitamin A in Betatene.

2. *Soybean Oil*

Beta carotene can impart color to food stuff or be bioavailable to the human body as provitamin A only if formulated. *Roche Vitamins III*, 772 F. 3d at 730. One way to overcome the challenge of bioavailability is first to dissolve it in an organic solvent such as soybean or other vegetable oils, as beta carotene is fat soluble. Appx362, Appx363, Appx988. The beta carotene is dissolved in soybean oil. Appx361, Appx362, Appx988.

14

These tiny droplets of oil containing the beta carotene particles are then embedded in the protective matrix. Appx363-366, Appx988-990.

### 3. *Gelatin*

Gelatin is a natural polymer derived from collagen found in animal tissues. It is a film forming polymer, and upon drying with the other ingredients forms a dense, impermeable, and physically stable matrix. Appx364, Appx365, Appx989. The gelatin together with the sucrose forms this stabilizing matrix. Appx364, Appx365, Appx989. This non-brittle, elastic matrix safeguards the beta carotene oily droplets from exposure to oxygen, moisture, humidity or UV rays and provides mechanical stability against external stresses that could cause the beadlet to crack and expose the beta carotene to those elements. Appx364, Appx365, Appx989.

### 4. *Sucrose*

Sucrose is a disaccharide of glucose and fructose. It works with the gelatin to form the matrix embedding the beta carotene droplets. Appx364, Appx365, Appx989. Also, the plasticizing effect created by the interaction of the sucrose and the gelatin gives mechanical stability to

15

the beadlet, which prevents damage during storage, handling or use. Appx364, Appx989.

### 5. Ascorbyl Palmitate

Ascorbyl palmitate is used as an antioxidant in Betatene. Appx365, Appx989. It provides a stabilizing function in the matrix by attacking oxygen that would degrade the beta carotene.

### 6. Mixed Tocopherols/Tocopherol-Rich Extract

Mixed tocopherols, also known as tocopherol-rich extract, are used also as an antioxidant in Betatene. Appx365, Appx989. Like ascorbyl palmitate, mixed tocopherols help stabilize beta carotene by preventing oxidation.

### 7. Silicon Dioxide

Betatene uses silicon dioxide as a flow aid and anti-caking agent. Appx365, Appx989. By adhering to the outer surface of the beadlets, it keeps them from agglomerating, producing a flowable powder. It remains in Betatene as a by-product of the manufacturing process.

### 8. Water

The beadlets are dried until a certain amount of residual moisture

remains. Appx366, Appx989. It serves no purpose and is a by-product of the manufacturing process. Further drying results in a matrix that may be more brittle.

B.   *The Manufacturing Process*

A stabilizing matrix is needed for beta carotene products, *Roche Vitamin III*, 772 F.3d at 730, and the imported Betatene is no different. Unlike other beta carotenes that are synthesized, the beta carotene in Betatene is obtained naturally from the alga *Dunaliella salina.* Appx360, Appx988. The algae are then harvested from the lagoons, and the carotenoids are extracted using d-limonene. Appx361, Appx988. This extract is then prepared and further concentrated as a suspension in the soybean oil, resulting in an oily dispersion consisting of approximately 30 percent beta carotene and 70 percent soybean oil. Appx361, Appx988.

Next, the beta carotene oily dispersion is transported to a tolling facility in Japan where it is formulated into microspheres, also known as the beadlets. Appx362, Appx988. This process involves the following steps. Mixed tocopherols are introduced as an antioxidant into the beta

carotene/soybean oil dispersion in the first phase. Appx363, Appx988. This mixture is then heated. *Id.* At the same time, in a second phase using heat and shear force, the gelatin is dissolved with the sucrose and the antioxidant ascorbyl palmitate in water. Appx362, Appx988. The two phases are then combined during a homogenization phase, creating an emulsion of all the ingredients. Appx362, Appx988.

The emulsion is then sprayed into a spray cooler tower. Appx363, Appx989. This results in the creation of droplets of the emulsion, with each droplet containing a proportional amount of the ingredients. Appx363, Appx989. The droplets freeze when sprayed into the cold air in the tower. After thawing, the droplets are dried using fluidized bed dryers. Appx364, Appx989. Air flow and temperature are controlled to dry the individual droplets, which causes the gelatin and sucrose in each droplet to combine into solid beadlets, which are microspheres measuring 240-300 micrometers and which embed the beta carotene oily droplets and antioxidants in the stabilizing protective matrix. Appx364, Appx989. Each beadlet consists of millions of micron-sized droplets of beta carotene dissolved in soybean oil. Appx366, Appx990.

Silicon dioxide is introduced into the process, where it functions as an anti-caking agent and flow aid, keeping the individual beadlets from agglomerating to each other or sticking to production equipment. Appx365, Appx989. After drying, the beadlets, now in powder form, are collected.

At this point, Betatene has been produced. The cross-section of a typical beadlet is represented by the following, with the blue colored area the gelatin and sucrose protective matrix; the white area the silicon dioxide anticaking agent; and the orange area the millions of droplets of beta carotene particles dissolved in the soybean oil in each beadlet. As stated above, each of these beadlets measure 240-300 micrometers in diameter, and make up the powder that is the formulated beta carotene product known as Betatene. Each beadlet contains at least 7.5 percent beta carotene, by weight. Appx005. Thus, the finished imported product is named Betatene® **7.5%** N (emphasis added).



C.    *The Uses of Betatene*

As discussed above, beta carotene has two inherent characteristics. It is provitamin A and organic coloring matter. It must be formulated to stabilize it and to render it commercially suitable for either use. *Roche Vitamins III*, 772 F.3d at 730. It is not a commercial product absent formulation. Appx359, Appx988.

BASF and other companies produce beta carotene formulations that are optimized for a range of commercial applications, such as oily

dispersions typically used for coloring certain foods or soft capsules, beadlet-based powders for tablets and hard capsule, or cold-water dispersible powders intended for applications in cold water. Different ingredients may be used in the various formulations. In all cases, however, the formulations do not chemically modify the beta carotene. Appx366, Appx990. It remains provitamin A and a colorant, albeit now bioavailable and stabilized. These formulations, while optimized for certain end uses, can be used for different applications as a source of provitamin A or color. Appx367, Appx368, Appx991, Appx992, Appx993.

Betatene is no different than the other beta carotene products in the marketplace. Like the formulated beta carotene product previously before this court in the *Roche Vitamins III* case ("BetaTab") Betatene is formulated to optimize its use as provitamin A in dietary supplement tablets and hard capsules and is marketed by the company as such. Appx367, Appx991. *See also*, *Roche Vitamins II*, 922 F. Supp. 2d at 1360-61 (Beta-Tab developed for and used in dietary supplement tablets). Like Beta-Tab, Betatene is a formulated beta carotene powder used as provitamin A, consisting of microencapsulated beadlets of gelatin and

sucrose, with added antioxidants, which stabilizes and preserves the beta carotene particles within it. Appx357, Appx360, Appx988. *See also, Roche Vitamins Inc. v. United States*, 750 F. Supp. 2d 1367, 1370 (Ct. Int'l Trade 2010) (*Roche Vitamin I*) (describing BetaTab as consisting of stabilized beadlets containing a finely dispersed solution of beta carotene in a corn starch-coated gelatin and sucrose matrix, with antioxidants present in the particles).

## SUMMARY OF ARGUMENTS

1.    The CIT erred as a matter of law when it failed to determine that for tariff classification purposes, Betatene falls squarely within the terms of heading 2936 and Chapter 29, Note 1(f). Uncontested facts before the CIT, which facts the CIT recites in its opinion and order in support of its decision, establish that Betatene falls within the *eo nomine* scope of heading 2936 as "[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . .." Furthermore, the CIT found that the beta carotene in Betatene was stabilized in accordance with Chapter 29, Note 1(f), in that the "quantities of stabilizing ingredients added to Betatene satisfy the

limitations explained in note 1(f) to Chapter 29." Appx014. As such, BASF established that Betatene was *prima facie* classifiable under heading 2936, meaning that as a matter of law, classification under heading 2106, as advocated by the United States, cannot stand. Betatene, being classifiable under heading 2936, is "elsewhere specified or included" and thus cannot be classified under heading 2106. The CIT's decision must be reversed based on the trial court's failure to follow GRI 1 and classify the Betatene in accordance with the terms of heading 2936, Chapter 29, Note 1(f) and heading 2106.

2.      The CIT misconstrued and misapplied *EN 29.36*. This *EN* looks at the ingredients and processing used to stabilize provitamins and vitamins. Stabilized provitamins and vitamins remain classified under heading 2936 if "the addition or processing does not **alter the character** of the basic product **and render it particularly suitable for specific use** rather than for general use." (emphasis added). The phrases "alter the character of" and "render it particularly suitable for specific use" create a compound condition connected by "and." Therefore, if the character of the provitamin or vitamin is not altered, the first half of the

joint connection is not met. In turn, this means that the mechanism needed to render the provitamin or vitamin particularly suitable for specific use is not triggered because the required alteration does not exist. The provitamin or vitamin remains a general use provitamin or vitamin per the clear language of *EN* 29.36.

The CIT concluded based on the record that the stabilizing ingredients and processing did not alter the character of the beta carotene, as it remained provitamin A. Appx015-016. Thus, the second condition in *EN* 29.36 is not triggered. Betatene's stabilizing ingredients and processing, therefore, are permissible under *EN* 29.36 and Betatene can be classified under heading 2936.

The CIT erred when it decoupled the compound condition in *EN* 29.36 and created two stand-alone conditions. Thus, the CIT's legal conclusion that Betatene's stabilizer ingredients and processing are outside what is permitted under *EN* 29.36 was erroneous because it applied the wrong test, even though it found that character of the beta carotene had not been altered by either the stabilizing ingredients or the processing.

3.     The Federal Circuit in *Roche Vitamin, Inc. v. United States*, 772 F.3d 728 (Fed. Cir. 2014) set out the criteria for determining when stabilizing ingredients or processing render provitamins or vitamins particularly suitable for a specific use. Like this case, the imported product in *Roche Vitamins* was formulated beta carotene composed of beta carotene dissolved in a solvent and then microencapsulated into beadlets consisting of a gelatin and sucrose matrix, with dl-alpha tocopherols, sodium ascorbate and ascorbyl palmitate as antioxidants and corn starch as a flow aid and anti-caking agent. The beadlets were created via a spray drying process.

The Federal Circuit in *Roche Vitamins* concluded that the stabilizing ingredients and processing did not render the beta carotene a specific use product. This result was based on the facts that 1) the ingredients were used to stabilize the beta carotene for preservation and transport, and 2) none of the ingredients were tableting excipients, which are necessary for the manufacture of vitamin and supplement tablets.

Similarly, the record before the CIT established that the ingredients and processing in Betatene were used to stabilize the beta

carotene for preservation and transport, and that no tableting excipients or other tablet ingredients were present in Betatene. Instead of following the Federal Circuit's criteria for analyzing *EN 29.36*, the CIT disregarded it and instead concluded that Betatene was distinguishable from the formulated beta carotene in *Roche Vitamins* because the former was "microencapsulated."

Not only did the CIT err when it did not follow the controlling authority of *Roche Vitamin* and review whether the ingredients were present as tableting ingredients rather that to stabilize the beta carotene in Betatene, it engaged in clear error on the issue of microencapsulation. Both the Betatene and the *Roche Vitamins* products are microencapsulated versions of formulated beta carotene. Both are micron-sized beadlets of beta carotene embedded in a gelatin and sucrose matrix, with anti-oxidants. Both are produced by spray-drying an emulsion of the ingredients until they harden into microspheres, which are the beadlet. Distinguishing Betatene from the product in *Roche Vitamins* based on a mistaken belief that Betatene was microencapsulated while the other was not, does not support the CIT's

decision to avoid the criteria adopted by the Federal Circuit for determining specific use under *EN* 29.36 for formulated beta carotene products.

4.      Similarly, the CIT erred when it did not follow the Federal Circuit's criteria for determining if the stabilizing ingredients and processing had rendered the formulated beta carotene something other than a general use product. In *Roche Vitamins*, the Federal Circuit looked at the role of the ingredients to see if the beta carotene, after being stabilized by those ingredients, still could be used as a source of provitamin A in other vitamin products, beverages and foods, and products other than tablets. Finding that it could meant the formulated beta carotene had not been processed beyond its general use for various applications.

The CIT erred again because the weight of evidence supports that Betatene can be used in a variety of non-tablet applications, and that its ingredients or formulation do not prevent its use as provitamin A in capsules, gummy vitamins, effervescent vitamins, fortified foods and beverages.   Nevertheless, the CIT deviated from *Roche Vitamin* on this

issue and disregarded the evidence showing Betatene's ability to function as a source of provitamin A in applications other than tablets.

## ARGUMENT

### I.  Standard of Review

This Court must review the CIT grant of summary judgment without deference to the trial court, and review questions of law de novo and factual findings for clear error. *Home Depot U.S.A., Inc. v. United States*, 491 F.3d 1334, 1335 (Fed. Cir. 2007). In doing so, this Court will employ a two-step process. First, it will ascertain the meaning and scope of the relevant HTSUS tariff provisions at issue. *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1366 (Fed. Cir. 1988). Then it will determine under which of the competing tariff provision the imported merchandise falls, a factual inquiry reviewed for clear error. *Id*.

Because no genuine issue exists as to what the imported merchandise is, this case raises the legal question of which tariff classification is correct. Merchandise entered into the United States is classified under the HTSUS. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). "The HTSUS scheme is organized by

headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *Alcan Food Packaging (Shelbyville) v. United States*, 771 F.3d 1364, 1366 (Fed. Cir. 2014) (citations and quotations omitted).

The principles set forth in the GRIs provide the framework for tariff classification. *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013). The court's review starts with GRI 1, which provides that "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes." The GRIs are applied sequentially, so if the proper heading can be determined via application of GRI 1, then "the court is not to look to the subsequent GRIs." *Dependable Packaging Solutions, Inc. v. United States*, 757 F. 3d 1374, 1378 (Fed. Cir. 2014).

Furthermore, the heading under which the imported goods were classified, heading 2106, is a "basket" provision applicable to goods "not elsewhere specified or included." The classification of imported merchandise in a basket provision is only appropriate when there is no

tariff category that covers the merchandise more specifically. *EM Indus., Inc. v. United States*, 999 F. Supp. 1473, 1480 (1998). That is because basket provisions are construed as broad, catch-all provisions that capture articles for which more specific headings do not exist elsewhere in the tariff. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002), *citing EM Indus., Inc.*

For the following reasons, if the Court concludes, as it should, that the imported merchandise is properly classified pursuant to GRI 1 under heading 2936, then as a matter of law that classification is more specific than heading 2106. Judgment must be entered for BASF, classifying the merchandise under 2936.90.01.

## II.   **Previous Beta carotene Litigations**

The nature of beta carotene being both organic coloring matter and provitamin A, and the tariff classifications associated with such formulated products when so used, has previously been reviewed by this Court twice.   *See*, *BASF Corp. v. United States*, 482 F.3d 1324 (Fed. Cir. 2007) ("*BASF I*") (classifying BASF's Lucarotin® 1% formulated beta carotene product as a colorant in subheading 3204.19.35 based on its use

as a colorant) and *Roche Vitamins III,* 772 F.3d 728 (classifying BetaTab as a provitamin in subheading 2936.10.00 based on its use as provitamin A in vitamin supplement tablets). These two decisions direct tariff classification of formulated beta carotene products, such as Betatene, according to their principal use as either a colorant or as a provitamin.

Like Betatene, Lucarotin®, the formulated beta carotene product in *BASF I,* was composed of a dispersion of beta carotene in soybean oil, which oil functioned as a carrier and stabilizer for the beta carotene. *BASF Corp. v. United States,* 391 F. Supp.2d 1246, 1249-1250 (Ct. Int'l Trade 2005). In turn, this oily dispersion of dissolved beta carotene was embedded in very fine beadlets of a dextrin (a polysaccharide) and d-glucose (a sugar) matrix, with dl-alpha tocopherol and ascorbyl palmitate as antioxidants and tricalcium phosphate as a flow aid. *Id. at* 1249. The product was formulated and marketed for use as a colorant in food products and other emulsions. *Id. at* 1250.

The trial court held that the Lucarotin® 1% formulated beta carotene product was classifiable as carotenoid coloring matter in subheading 3204.19.35. On appeal, the Federal Circuit affirmed. *BASF*

*I*, 482 F. 3d 1328. The Federal Circuit, applying the *eo nomine* rule of tariff construction and the specificity rules, concluded that the decision of the Court of International Trade was correct, and affirmed classification of the Lucarotin® 1% formulation under subheading 3204.19.35 as "[b]eta carotene and other carotenoid coloring matter." *Id*. Thus, the Federal Circuit directed beta carotene formulations primarily used as a colorant into subheading 3204.19.35 (now 3204.18.00).

A few years later, both BASF and Roche Vitamins sued at the CIT seeking to have formulated beta carotene intended for use as a provitamin also classified under subheading 3204.19.35, but duty-free under the special tariff program called the Pharmaceutical Appendix, or, in the alternative, under heading 2936 as a provitamin. Both parties brought summary judgment motions seeking either classification. *See*, *Roche Vitamins I*, 750 F. Supp.2d 1367; *BASF Corp. v. United States,* 798 F. Supp.2d 1353 (Ct. Int'l Trade 2011) ("*BASF II*"). Both parties' motions were denied, as the courts found questions of fact existed requiring trial. *Roche Vitamins I* at 1369; *BASF II* at 1355.

Thereafter, a trial was had in the *Roche Vitamins* case. *Roche Vitamins* involved BetaTab. BetaTab was composed of approximately 20-30% beta carotene, embedded in beadlets consisting of a gelatin and sucrose matrix, with dl-alpha tocopherols, sodium ascorbate and ascorbyl palmitate as antioxidants and corn starch. *Roche Vitamins II,* 922 F. Supp. 2d at 1361.

The CIT classified BetaTab under subheading 2936.10.00 as "Provitamins, unmixed."[3] *Id. at* 1363. At trial, the CIT found that the stabilizing ingredients in the formulation were necessary and did not render the beta carotene suitable for a specific rather than a general use, even though the high potency and high bioavailability made it preferable for the manufacture of vitamin supplement tablets by the dietary supplement industry. *Id* at. 1362. The court also found that BetaTab did not contain any ingredients "specifically prepared for tableting." *Id.* As such, Beta-Tab was provided *eo nomine* under heading 2936 and Chapter

_____

3  The subheadings under heading 2936 were renumbered in 2007.   As a result, from 2008 forward provitamins are classified under subheading 2936.90.01.

29, Note 1.

On appeal, the U.S. Court of Appeals for the Federal Circuit affirmed. *Roche Vitamins III,* 772 F.3d at 733. The Federal Circuit noted that it was undisputed that the stabilizing ingredients in the formulation were not present in quantities greater than necessary to achieve stabilization. *Id* at 732. It also concluded that the formulation process did not alter the beta carotene's character as provitamin A, nor did it prepare the product for tableting. *Id* at 732-33. Because the BetaTab formulation **could be** used as a source of provitamin A in foods, beverages, and vitamin products, it remained suitable for general use as provitamin A, even though it was formulated and marketed for use in vitamin supplement tablets or capsules. *Id* at 733. In its decision, the Federal Circuit noted that the stabilizers used in the BetaTab "were essentially the same as those used to stabilize other vitamins and beta carotene products . . .." *Id* at. 732.

The decision in *Roche Vitamins III* very clearly directs classification of formulated vitamin and provitamin products used for their vitamin or provitamin activity under heading 2936. Both the Court of International

Trade and the Federal Circuit in the *Roche Vitamins* decisions were clear that the formulation process did not change the character or function of the active ingredient, in that the beta carotene remained provitamin A that could function as such. *Roche Vitamins II*, 922 F. Supp. 2d at 1362; *Roche Vitamins III*, 772 F.3d at 732, 733. The courts also concluded that the inert ingredients used to create the formulated product were not present in quantities greater than necessary to achieve stabilization, nor were they added to provide downstream characteristics required to make vitamin tablets. *Roche Vitamins II* at 1362; *Roche Vitamins III* at 732. The courts noted that the ingredients used to stabilize the beta carotene were essentially the same as those used to stabilize other vitamins and beta carotene formulations. *Roche Vitamins II* at 1362; *Roche Vitamins III* at 732.

Thus, *BASF I* and the *Roche Vitamins* decisions create a dichotomy for classifying formulated beta carotene products. Beta carotene formulations used as provitamin A are classified under heading 2936 as a provitamin as per *Roche Vitamins III*, while beta carotene formulations used as a colorant are classified under heading 3204 (or 3203 if the beta

carotene in the colorant formulation is natural rather than synthetic) as per *BASF I*. Based on this dichotomy, Betatene, a formulated beta carotene product used as provitamin A in vitamin applications, should be classified under heading 2936 as a provitamin.

## III.  Betatene is Provided for *Eo Nomine* in Heading 2936 and Chapter 29, Note 1(f)

Tariff classification under the HTSUS is hierarchical and requires that goods be classified under the most specifically descriptive tariff heading. *GE-Med. Sys. Group v. United States*, 247 F.3d 1231, 1235 (Fed. Cir. 2001). There are three main types of headings under the HTSUS: *eo nomine*, use, and basket provisions. An *eo nomine* provision describes commodities by well-known names or terms and includes all items falling into that category regardless of form. *Nidec Corp. v. United States,* 68 F.3d 1333, 1336 (Fed. Cir. 1995).

Heading 2936 is an *eo nomine* tariff classification. It provides for imported goods that are: "Provitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . .." *See, Sigma-Tau Health Science, Inc. v. United States*, 838 F.3d 1272, 1278

(Fed. Cir. 2016) (construing heading 2936 as an *eo nomine* tariff provision).

Tariff classification under the HTSUS implicates not just the language of the headings, but where applicable the General Notes, the General Rules of Interpretation ("GRIs"), the Additional U.S. Rules of Interpretation ("U.S. GRIs"), section and chapter notes. *North. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001). According to GRI 1, "classification shall be determined according to the terms of the heading and relevant section or chapter notes." *Id.* The language of the heading and any applicable section or chapter notes establish whether the product is classifiable under that heading, with those terms construed according to their common and commercial meaning. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

In this case, the tariff classification of Betatene turns on the language of the tariff description set out in heading 2936, and application of Chapter 29, Note 1 to the extent Note 1 is not otherwise preempted by the context of the heading's description. Specifically, to be covered by

heading 2936 and Note 1 to Chapter 29, Betatene must be, in pertinent part, 1) a provitamin or vitamin; 2) of natural or synthetic origin; 3) either in, or not in, a solvent, and 4) formulated in a manner consistent with Chapter 29, Note 1.

The trial court described Betatene as a beta carotene formulation; found that the beta carotene in Betatene is provitamin A; that the beta carotene is of natural origin; and that the beta carotene is first dissolved in a solvent. Appx003. It also found that Betatene's was a source of provitamin A used as an ingredient by the vitamin and dietary supplement industry to produce vitamin and dietary supplement tablets and capsules. Appx005. Not only did the trial court describe the merchandise in these terms, but these facts were not contested. Appx358, Appx360, Appx361, Appx367, Appx987, Appx988, Appx991. As such, the facts before the trial court established that the imported merchandise consists of a natural provitamin, as required under the *eo nomine* language of heading 2936.

The trial court then focused on whether the stabilizing matrix and antioxidants in Betatene satisfied Chapter 29, Note 1(f). This Chapter

Note limits the headings in Chapter 29 to "[t]he products mentioned in (a), (b), (c), (d) or (e) above with an added stabilizer (including an anticaking agent) necessary for their preservation of transport." The reference to "products," as it relates to heading 2936, is to vitamins or provitamins that have characteristics that satisfy Notes 1(a) through (e), if applicable. Thus, if Betatene's protective matrix is a stabilizer necessary for preserving or transporting the beta-carotene in the Betatene product, then Note 1(f) is satisfied.

The CIT found that Betatene satisfied this requirement too, expressly stating that the "quantities of stabilizing ingredients added to Betatene satisfy the limitations explained in note 1(f) to Chapter 29." Appx014. At this point, the trial court had described a product provided for by both the *eo nomine* statutory language of heading 2936 and by Chapter 29, Note 1(f). Appx003–005, Appx014. *See, Del Monte Corp. v. United States,* 730 F.3d 1352, 1354 (Fed. Cir. 2013) ("[d]etermining the proper classification requires first construing the relevant provisions of the [HTSUS] and then deciding which provisions encompasses the merchandise at issue"; *see also, Sigma-Tau Health Science, Inc. v. United*

*States*, 838 F.3d 1272, 1278 (Fed. Cir. 2016) (recognizing that heading 2936 encompasses vitamins and provitamins and that Chapter 29, Note 1(f) explicitly extends that reference to vitamins and provitamins stabilized for preservation or transport).

Based on this, the trial court erred by not entering judgment for BASF, as BASF had established its *prime facie* case that Betatene was provided for under heading 2936 and Chapter 29, Note 1(f). *See, Sigma-Tau Health Science, Inc. v. United States*, 838 F.3d at 1282 ("[h]aving defined 'vitamin', we turn to whether carnitine is prima facie classifiable as such under HTSUS heading 2936. We hold, based on the undisputed evidence of record, that the CIT's conclusion on this point was correct: carnitine is prima facie classifiable as a vitamin"). As a matter of law, therefore, Betatene satisfies the *eo nomine* language of heading 2936 and Chapter 29, Note 1(f). In turn, it is elsewhere specified or included under heading 2936 and thus excluded from heading 2106 by the terms of heading 2106.

**IV. The Trial Court Misapplied the Holding in *Roche Vitamins* As Neither the Stabilizing Ingredients nor the Processing They Undergo Render the Beta carotene Particularly <u>Suitable for Specific Use Rather than General Use.</u>**

Instead of stopping here and holding for BASF based on the principles of tariff construction set out in GRI 1 and the factual record before it, the trial court turned to the nonbinding *ENs* and changed the classification inquiry to whether "[Betatene] satisfies the limitations of **note 1(f) to chapter 29, and EN 29.36**, i.e. to be classifiable as a provitamin under heading 2936 . . .." Appx013 (emphasis added).[4]

---

[4] While the *EN*s are helpful guidance to understanding the meaning of HTSUS terms, this Court has held on multiple occasions that the *ENs* cannot be employed to narrow or alter the statutory language of the HTSUS, whether it be a heading or a chapter note. *See, Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1359 (Fed Cir. 2003) (limiting characteristics of examples in the *ENs* cannot narrow the language of the heading); *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1281 (Fed. Cir. 2016) (contradictory language in the *EN*s disregarded for purposes of construing the heading); *Apple Inc. v. United States*, 964 F.3d 1087, 1095, 1096 (Fed. Cir. 2020) ("Explanatory Notes cannot create an exception to an HTSUS heading . . . [as] they are not binding. . . . They cannot be used to 'narrow' or amend or create ambiguity in 'the language of [a] [HTSUS] heading'" *citing Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1359 (Fed Cir. 2003)). Yet, the trial court did exactly that in this case by incorporating nonbinding *EN 29.36* as a requirement for classification under heading 2936 and Chapter 29, Note 1(f).

*EN 29.36* reads in pertinent part:

> The products [vitamins and provitamins] of this heading [2936] may be stabilised for the purposes of preservation or transport:
>
> - by adding anti-oxidants,
>
> - by adding anti-caking agents (e.g., carbohydrates),
>
> - by coating with appropriate substance (e.g., gelatin, waxes or fats), whether or not plasticised, or
>
> - by adsorbing on appropriate substances (e.g., silicic acid),

provided that the quantity added or the processing in no case exceeds that necessary for their preservation or transport and that the addition or processing does not alter the character of the basic product and render it particularly suitable for specific use rather than for general use.

---

Had the drafter chosen to limit Chapter 29, Note 1(f) in such a manner they could have drafted language to that effect, like they did for Chapter 29, Note 1(e) and Note (g). *See*, Chapter 29, Note 1(e) ("Products mentioned in (a), (b) or (c) above dissolved in other solvents provided that the solution constitutes a normal and necessary method of putting up these products adopted **solely for reasons of safety or for transport and that the solvent does not render the product particularly suitable for specific use rather than for general use**"); Chapter 29, Note 1(g) ("The products mentioned in (a), (b), (c), (d), (e) or (f) above with an added antidusting agent or a coloring or odoriferous substance added to facilitate their identification or for safety reasons, **provided that the additions do not render the product particularly suitable for specific use rather than for general use**").

Having already determined that Betatene was provitamin A stabilized for preservation and transport by the presence of the plasticized gelatin and sucrose matrix and antioxidants, Appx003–005, Appx014, the trial court focused on the proviso portion of *EN 29.36*, distilling it into the following three requirements for classification under heading 2936:

> 1. Betatene must not have more stabilizers than necessary for preservation or transport;
>
> 2. The addition of stabilizer ingredients and the manufacturing process must not alter the character of Betatene as a beta carotene product; and
>
> 3. The addition of stabilizer ingredients and the manufacturing process must not render the Betatene particularly suitable for specific use rather than for general use.

The trial court found that the evidence of record demonstrated that BASF had satisfied points one and two, Appx013-016, but had failed on point three, Appx016-021, as discussed *supra* at pages 6 to 10. Here is where the trial court committed its next reversible error, by finding that the stabilizer and its manufacturing process rendered the beta carotene in Betatene particularly suitable for specific use.

A. *Having Found that the Stabilizer Ingredients and Manufacturing Process Did Not Alter the Character of the Beta carotene in Betatene, the CIT Erred by Continuing its Analysis of the Specific Use Criterion.*

The trial court erroneously misconstrued the proviso in EN 29.36, especially its second requirement. That requirement – "that the addition or processing does not **alter the character** of the basic product **and render it particularly suitable for specific use** rather than for general use" (emphasis added) – contains a compound condition separate by "and." The phrasing "alter the character" and "render it particularly suitable for specific use" means a causal relationship exists, where the alteration of the vitamin/provitamin's character is the means by which it is rendered suitable for a specific use. "Render" is a causative verb introducing a result, *e.g*, "render it particularly suitable," meaning that the alteration of the vitamin/provitamin's character is the event that must cause the vitamin/provitamin to become (i.e., "rendered") suitable for a specific use.

This means that if the character of the vitamin/provitamin is not changed, the process of "rendering" it into something for a specific use

cannot occur because the predicate change did not occur. The two conditions are joined by "and," so that the entire clause describes a prohibited outcome, the violation of which requires the addition of the stabilizing ingredients and the processing: 1) to change the vitamin/provitamin's nature, 2) AND for that change to make the vitamin/provitamin particularly suitable for a specific use. Unless the quantity of the stabilizer ingredients or the processing involved in formulating the stabilizer triggers a finding that both conditions are satisfied, then classification under heading 2936 as a formulated vitamin/provitamin is not foreclosed by *EN 29.36*.

Instead, the trial court delinked and eliminated the causal relationship set out in *EN 29.36*, and set out each condition as an independent requirement that needed to be satisfied[5]:

---

[5] The trial court misstates the *EN 29.36's* requirements. It does not require, as the trial court states, that the addition of the stabilizer ingredients/manufacturing process "not alter the character of Betatene as a beta carotene product." Appx013. Betatene is the trade name of the finished, imported, formulated beta carotene product. Instead, *EN 29.36* questions whether the character of the "products of this heading" – the vitamin or provitamin (in this case, beta carotene as provitamin A) – are altered by the addition of the stabilizing ingredients or the process by which the stabilizer is prepared. It is the character of the provitamin

2. The addition of stabilizer ingredients and the manufacturing process must not alter the character of Betatene as a beta carotene product; and

3. The addition of stabilizer ingredients and the manufacturing process must not render the Betatene particularly suitable for specific use rather than for general use.

Appx013. It then proceeded to find (as set out above) that the addition of the stabilizer ingredients and the manufacturing process did not alter the inherent character of the beta carotene in Betatene as being provitamin A. Appx015.

Based on this finding, the trial court's analysis should have stopped, and had the CIT applied properly *EN 29.36* to reflect this requirement,

being formulated, not the finished formulated product, that *EN 29.36* reviews to see whether there has been a change in character.

Nor should it have phrased the second condition as it did. *EN 29.36* does not require that Betatene not be rendered particularly suitable for specific use rather than for general use by the addition of stabilizer ingredients and the manufacturing process. Instead, *EN 29.36* evaluates the beta carotene -- the provitamin contemplated by heading 2936 – to see whether changes in its characteristics have been brought on by the ingredients/processing, which render the beta carotene a specific use product.

then the decision below would have been different. The trial court found that the addition of the stabilizing ingredients used to stabilize the beta carotene, and the process by which the beta carotene was formulated, "do not alter the character of the beta carotene or Betatene's ability to function as provitamin A." Appx016. This conclusion was based on the parties' agreement that "[n]othing in [Betatene's] formulation changes the beta carotene's inherent character as a source of provitamin A," Appx015, as well as expert witness testimony that the processing did not chemically modify the beta carotene in Betatene or change it as a source of provitamin A. Appx016.

Correspondingly, because the character of the beta carotene as provitamin A was not changed, no change in character exists that could render the beta carotene particularly suitable for a specific use. It remained provitamin A, to be used after importation as provitamin A by the vitamin supplement industry. Heading 2936, Chapter Note 1(f) and now *EN* 29.36 are all satisfied. Considering this, the CIT erred by not classifying Betatene under heading 2936 as a stabilized provitamin.

### B. Neither the Stabilizing Ingredients nor the Process by Which the Stabilizer is Created Altered the Character of the Beta carotene to Render it a Specific Use Product

For the reasons stated above, the trial court misapplied EN 29.36 by delinking the requirement that an alteration of the vitamin's or provitamin's character be present first and that this alteration result in a specific use product. Notwithstanding this error, the trial court committed additional errors in its analysis of, and application of the facts to, the specific versus general use language in *EN* 29.36.

The concept of what constitutes a specific use rather than a general use for formulated beta carotene products in the context of Chapter 29, Note 1(f) was addressed at length in the *Roche Vitamins III* case. On specific use, the *Roche Vitamins* court focused on whether the stabilizing ingredients were present to stabilize the beta carotene or rather were added because they were the types of ingredients needed to make a vitamin supplement tablet. *Roche Vitamins III,* 772 F.3d at 732. The *Roche Vitamins III* court acknowledged that although BetaTab (like Betatene) was designed and sold for use in vitamin tablets and capsules, as its "high concentration and high bioavailability . . . make it preferable

for the manufacturers of tablets," that fact, in and of itself, did not make it a specific use product. *Id.*

Instead, the *Roche Vitamins III* court focused on the role the stabilizing ingredients played in BetaTab. First, the Federal Circuit found that the BetaTab formulation contained no tableting excipients,[6] which are additional ingredients added by vitamin and supplement companies when producing finished vitamin and dietary supplement tablets that contain vitamins and/or provitamins as the active ingredient(s). *Id.*

Having found no tableting excipients present in BetaTab, the Federal Circuit investigated the role of the ingredients in the formulation. It found that the gelatin, sucrose and antioxidants used to make BetaTab's stabilizing matrix were present to stabilize the beta carotene, reinforcing how they were not present to function as tablet excipients. *Id.* Based on these facts, the Federal Circuit held that the stabilizing ingredients did not alter the character of the beta carotene

---

[6] Tablet excipients include ingredients such as fillers, binders and disintegrants. Appx368, Appx993.

and specifically prepare it for tableting. *Id.* at 732-733. In fact, the *Roche Vitamin III* court expressly recognized that the "stabilizers used in BetaTab were essentially the same as those used to stabilize other vitamins and other beta carotene products that were marketed as colorants." *Id.* at 732. Formulated beta carotene products marketed for use as colorants are not rendered particularly suitable for tableting, yet the Federal Circuit recognized that the stabilizing matrix in those products were "essentially the same" as that found in BetaTab (same as Betatene).

Thus, the Federal Circuit in *Roche Vitamins III* focused on the finished tablet as a "specific use" and determined that none of the ingredients used to create the stabilizer in Beta-Tab were added to function as tableting ingredient. Instead, the stabilizing ingredients (sucrose, gelatin, antioxidants) functioned in concert to stabilize the beta carotene in BetaTab and not to function as tableting excipients in the post-importation production of vitamin supplement tablets, notwithstanding that "BetaTab was developed specifically 'for use in high potency and anti-oxidative vitamin tablets.'" *Id.* at 729, *quoting Roche*

*Vitamins II*, 922 F. Supp. 2d at 1361.

The same conclusion must be reached as to Betatene, because facts supporting that conclusion are not in dispute. The parties agreed that "[t]he formulation of [Betatene] stabilizes and preserves the beta carotene, which if not stabilized and preserved would oxidize rapidly, degrade, or be contaminated, rendering the beta carotene ineffective for any use." Appx360, Appx988. The parties also agreed that "[v]itamin tablet manufacturers use tableting excipients such as fillers, binders, or disintegrants, as well as active ingredients, when making finished vitamin tablets for consumer use." Appx368, Appx993. Most importantly, the parties agreed that "[Betatene] does not contain any tableting excipients." Appx369, Appx993.

The stabilizing ingredients in Betatene are of the same class or kind of stabilizing ingredients as those used to stabilize the beta carotene in BetaTab. Betatene is a powder consisting of beadlets containing a minimum of 7.5 percent beta carotene dissolved in a solvent, in a stabilizing matrix made of gelatin and sucrose, with ascorbyl palmitate and tocopherols present as antioxidants, and silicon dioxide as an anti-

caking agent and flow aid. Appx003, Appx357, Appx987. Likewise, Beta-Tab is a powder consisting of beadlets containing 20–30 percent beta carotene dissolved in a solvent, in a stabilizing matrix made of gelatin and sucrose, with three added antioxidants and corn starch as an anti-caking agent and flow aid. *See, Roche Vitamins II* 933 F. Supp. 2d at 1361; *see also, Roche Vitamins I*, 750 F. Supp. 2d at 1370.

The principal difference between the two products is the amount of beta carotene present in the final formulation: a minimum of 7.5 percent for Betatene, and between 20 and 30 percent for BetaTab.[7] Otherwise, the stabilizing ingredients are the same – gelatin, sucrose, antioxidants, with an anti-caking agent/flow aid. As the Federal Circuit held, these ingredients are not used as tableting ingredients but rather are used to stabilize the beta carotene for preservation and transport. *Roche Vitamins III*, 772 F.3d at 722, 723.

At this point, undisputed and agreed to facts were before the trial

---

[7] In microencapsulated versions of formulated beta carotene, like Betatene and BetaTab, the more beta carotene present in the beadlet means less space exists for the stabilizing ingredients, which must be adjusted accordingly to create a stabile product.

court establishing that the stabilizing ingredients in Betatene were present only to stabilize the beta carotene and were not of the type or class of ingredients used as excipients in tablet production. As per *Roche Vitamins III*, this means Betatene's stabilizing ingredients and processing did not alter the character of the beta carotene and render it particularly suitable for use as a vitamin tablet any more than the ingredients and processing did in *Roche Vitamins III. Roche Vitamins III* construed the "specific use" reference in *EN 29.36* and established the criteria for determining when the stabilizing ingredients and processing have rendered beta carotene a specific use product. These criteria were not followed by the trial court, resulting in its reversible error. *See, Blue Sky the Color of Imagination, LLC v. United States*, 160 F.4 1334, 2025 U.S. App. LEXIS 31531, pp. 6-7 (Fed. Cir. 2025), ("[s]tare decisis commands respect for past interpretation of a tariff classification term . . ..")

1. Both Betatene and BetaTab are
   Made by the Microencapsulation Process

Instead, the trial court found Betatene was produced via "microencapsulation," which the trial court said distinguished it from BetaTab. Appx017. In turn, the court found that because Betatene was "microencapsulated," it was rendered suitable for tableting. Appx017.

But both Betatene and BetaTab are microencapsulated beta carotene formulations. Error, therefore, lies in the trial court's misunderstanding of microencapsulation, and then basing its analysis of the "specific use" reference found in *EN 29.36* on its mistaken belief that Betatene was distinguishable from BetaTab because it was produced via microencapsulation while BetaTab was not.

Microencapsulation is the process of preparing microcapsules, also known as microspheres. They are small spheres that use a coating or wall to enclose a core and can range from 1 µm up to 7mm. N.Madhavi, Ch. Sai Shivani Reddy, V.T. Iswariya, K. Mary Swarnalatha, & A. Harshika, *Microspheres and Micro Capsules: A Concised Review*, 20 Neuro Quantology, 2517 (2022).

The trial court identified the Betatene microencapsulation process

as follows. "Betatene is 'enrobed in a protective matrix of gelatin and sucrose,' which 'embeds the oily beta carotene and antioxidant droplets' and 'combine[s] [them] into solid beadlets,'" Appx017, with the gelatin and sucrose plasticizing the matrix of the beadlets.[8] Appx017-018. The trial court noted that the microencapsulation process started when the beta carotene/soybean oil solution and the mixed tocopherols, an antioxidant, were introduced. Appx004. Simultaneously, gelatin and sucrose were dissolved in water, and a second antioxidant, ascorbyl palmitate, was added. Appx004. These two phases were combined, with the corresponding emulsion then sprayed into a cooling tower, resulting in "'the creation of liquid microspheres, or droplets, of the emulsion, with each microsphere containing a proportional amount of ingredients.'" Appx004. The droplets dried, causing the gelatin and sucrose to form solid beadlets, to which silicon dioxide was added as a flow aid and anti-caking agent. Appx005.

---

[8] *EN 29.36* recognize that the stabilizer may be plasticized: "[t]he products of this heading may be stabilised for the purposes of preservation or transport: . . . by coating with appropriate substance (e.g., gelatin, waxes or fats), whether or not plasticized . . ."

Compare that with the way BetaTab is produced:

> BetaTab 20% is produced by dissolving beta carotene crystalline powder in a solvent along with [two additional stabilizing antioxidants]. Separately, gelatin, sucrose, and [a third stabilizing antioxidant] are dissolved in the water. The two solutions are blended together to produce an emulsion after which the solvent is distilled from the emulsion. The emulsion is then sprayed as droplets into corn starch. The resulting particles are dried, freed from excess corn starch and filled into containers. The particles are in the shape of microspheres, and are referred to as beadlets.

*Roche Vitamins I,* 750 F. Supp. 2d at 1370. The record before the trial court also established that the gelatin and sucrose plasticized the BetaTab beadlets. Appx1307.

Clearly, both Betatene and BetaTab beta carotene formulations are created by microencapsulation. Both are powders of solid beadlets, formed when an emulsion of the stabilizing ingredients (glucose, gelatin and antioxidants) and the dissolved beta carotene particles is sprayed, creating droplets that then dry, microencapsulating the beta carotene particles in the stabilizing matrix of the now formed beadlet. As the trial court in *Roche Vitamins* noted: "[t]he process used to create BetaTab, that is, the technology by which Roche adds additional ingredients that

56

envelop the beta carotene crystalline in a matrix, is common throughout the industry for several different types of vitamins." *Roche Vitamins II*, 922 F. Supp. 2d at 1362. This makes sense, as a "stabilizing matrix of some kind is necessary for any beta carotene product." *Id.*

In fact, the formulated beta carotene product in *BASF I*, Lucarotin® 1%, was also microencapsulated, even though it was manufactured and marketed for use as a colorant rather than a provitamin. *BASF Corp. v. United States*, 391 F. Supp. 2d 1246, 1249-50 (Ct. Int'l Trade 2005) ("Lucarotin® 1% . . . consisting of a dispersion of beta carotene stabilized in soybean oil, which is embedded in the form of very fine beadlets in a matrix of dextrin and d-glucose. It is stabilized with dl-alpha tocopherol and ascorbyl palmitate and contains tricalcium phosphate as a flow-aid" and "is sold for use as a food colorant"). Lucarotin® 1% is proof that "microencapsulation" does not render beta carotene particularly suitable for use as tablets, as this product is not used for vitamin activity in vitamins or supplement tablets. *See also, Roche Vitamins II,* 922 F. Supp. 2d at 1362 ("[t]he additional ingredients, or matrices, of the various Roche products are 'basically the same' for lower potency products . . .

used for coloration purposes as for higher potency products that are used for vitamin and nutritional product").

The trial court was wrong to distinguish Betatene from BetaTab based on its mistaken belief that the former product was the result of microencapsulation while the latter was not. Both products are powders consisting of beadlets produced via microencapsulating beta carotene in a stabilizing matrix. Thus, microencapsulating the Betatene ingredients no more rendered the beta carotene a specific use product than did microencapsulating the BetaTab ingredients.

2.      The Fact that Betatene is Used as a
Provitamin Ingredient in Vitamin and
Supplement Tablets and Capsules Does
Not Make it Particularly Suitable for a Specific Use

Then, the trial court doubled down on its flawed analysis by equating Betatene's use after importation as a provitamin A ingredient in the manufacture of vitamin or supplement tablets and capsules, as proof that the stabilizing ingredients and processing had altered the character of the beta carotene in it and rendered it particularly suitable

for specific use a tablet. This, too, is grounds for reversal.

In *Roche Vitamins III*, BetaTab had been developed "'for use in high potency and anti-oxidative vitamin tablets'" based on the "'high concentration and high bioavailability of beta carotene,'" making it "'preferable for use in dietary supplement tablets.'" *Roche Vitamins III*, 772 F.3d at 729, *quoting Roche Vitamins II*, 922 F. Supp. 2d at 1361. Notwithstanding that BetaTab's ingredients made it highly suitable for tableting, the Federal Circuit still found that those ingredients did not render it particularly suitable for tableting because they were not tableting excipients. *Id.* at 732. Rather, the ingredients present in BetaTab functioned as stabilizers for the beta carotene. *Id.*

The same is true for Betatene. Betatene contains no tableting excipients. Appx369, Appx993. The formulation of Betatene stabilizes and preserve the beta carotene. Appx360, Appx988. These uncontested facts do not support the trial court's decision that the ingredients in Betatene's formulation rendered it particularly suitable for creating vitamin and supplement tablets. The CIT's decision clearly conflicts with the decision of the Federal Circuit in *Roche Vitamins III* on this point,

59

resulting in the trial court's error when it found that the ingredients in, and formulation of, Betatene altered the beta carotene in the formulation and rendered it for a specific use, rather than simply stabilizing the beta carotene for preservation and transport.

C. *The Stabilizing Ingredients and the Process Do Not Alter the Character of the Beta carotene in Betatene from that of General Use*

Failing back on its misunderstanding of "microencapsulation," the trial court held that "record evidence establishes that Betatene is not suitable for general use after microencapsulation." Appx020. Again, the trial court failed to follow the precedent set by the Federal Circuit in *Roche Vitamins III* on this issue, thus compounding its erroneous application of *EN* 29.36.

First, the BetaTab product in *Roche Vitamins III* is produced via microencapsulation just as Betatene is, as explained *supra* at pages 54 to 57. Notwithstanding this fact, the Federal Circuit found that the BetaTab microencapsulated beta carotene formulation "**can** thus be used as a source of [pro]vitamin A in foods, beverages, and vitamin products."

60

*Roche Vitamins III*, 772 F.3d at 733 (emphasis added) (finding BetaTab "'wellsuited'" and "'suitable for general use as provitamin A'") (internal citations omitted). The fact that BetaTab consisted of microencapsulated beadlets did not prevent its general use outside of vitamin tablets.

Importantly, the Federal Circuit, by using the modal verb "can," recognized that the "general use" criterion contemplated the ability or possibility to function as provitamin A in non-tablet applications, not that it actually be used that way. *See also, Roche Vitamins II*, 922 F. Supp. 2d at 1363 (noting that the "'vast majority of'" BetaTab has been used in vitamin supplements and is principally so used) (internal citations omitted).

Likewise, Betatene can be used as a source of provitamin A in foods, beverages, and vitamins, and evidence in support thereof was before the court below. BASF's fact and expert witnesses testified that Betatene can be used as a source of provitamin A:

1.     In gummy vitamin form. Appx593-594.

2.     In effervescent vitamin form. Appx594.

3.     In fortified foods. Appx614.

4. To color foods. Appx614.

To quote BASF's expert witness:

> Nothing in the formulation of Betatene® 7.5% N prevents it from only being used as provitamin A in supplements (capsules and tablets) but, the formulation can also be used as a colorant and for other applications, such as food fortification. Nothing in the formulation will prevent it from being used as a vitamin and/or colorant. It can be used as a vitamin source in other applications such as Functional Foods (bars, chews, beverages and the like).

Appx629.

The United States' expert confirmed this too, testifying under oath that nothing about the stabilizing formulation of Betatene prevented it from being used as a source of provitamin A in other pill forms, beverages, or other fortified foods, if the manufacturer of the product using Betatene chose to use it that way:

1. In gummy vitamin form. Appx546.

2. In effervescent vitamin form. Appx546.

3. In fortified beverages. Appx547.

4. To color foods. Appx549.

Even the United States conceded, begrudgingly, that the stabilizer in Beatene does not make it "physically impossible" to use Betatene as a

source of provitamin A:

1.    In gummy or other non-tablet vitamin forms. Appx992, Appx368.

2.    In fortified foods and beverages. Appx992, Appx368.

3.    To color foods. Appx367, Appx991.

Lastly, the parties agreed that Betatene is formulated and marketed for use by vitamin and supplement manufacturers in hard capsules in addition to tablets. Appx367, Appx991. Hard capsule form is a different pill form from that of hard tablet form, with different physical characteristics. Appx367, Appx991. Here, the parties agreed that Betatene's formulation does not prevent it from being used in a form different from that of a tablet and acknowledged that it was formulated and marketed for non-tablet use in hard capsules.

Notwithstanding this record, the trial court identified "microencapsulation" as the reason why Betatene's stabilizer rendered it unsuitable for general, non-tablet uses, finding that such other non-tablet uses required the beadlet to be "de-formulated." Appx020. It cited testimony regarding the taste one might experience if they bit into food

fortified with Betatene. Appx020. But the trial court cites no evidence explaining how or why Betatene would need to be "de-formulated" before it could be used as a source of provitamin A in a vitamin form other than tablets, such as hard capsules, which are swallowed whole and then processed by the human digestion tract. And before BetaTab could be used in beverage applications, the liquid needed to be warm enough to dissolve the gelatin in the matrix. See, *Roche Vitamins II*, 922 F. Supp. 2d at 1361 (BetaTab is only dispersible in water above 20° Celsus)

Again, to compare Betatene with BetaTab, any issue regarding the need to de-formulate the former's beadlet before it could be used in different provitamin A applications also would exist with BetaTab's beadlet. Instead, the test framed by the Federal Circuit in *Roche Vitamins* is whether the formulated beta carotene remains suitable for general use because it "can thus be used" in different applications. *Roche Vitamins III*, 772 F.3d at 733.

Applying that test to Betatene, the record below establishes that Betatene's status as provitamin A is not changed by the stabilizing ingredients or the process by which the stabilizer is produced. Those

ingredients have not rendered it incapable of being provitamin A in other vitamin forms or in foods or beverages. The stabilizing ingredients leave the beta carotene in Betatene in a state where it is still suitable for general use as a source of provitamin A across applications, as discussed *supra*.

As noted in *Roche Vitamin*, "the stabilizers used in BetaTab were essentially the same as those used to stabilize other vitamins and other beta carotene products that are marketed for use as colorants." *Roche Vitamins III*, 772 F.3d at 730. This industry-wide process used for stabilizing vitamins and provitamins does not deprive the beta carotene of its ability to deliver on its inherent character of being provitamin A or a colorant. In its condition as imported, it remains well suited to provide its inherent general use character as provitamin A across all applications.

Heading 2936 applies to vitamins and provitamins, capturing a wider range of products than simply formulated beta carotene. Under that heading and Chapter 29, Note 1, products stay in Chapter 29 if the manufacturing process and stabilizers preserve the vitamin's or provitamin's status as a "separate chemically defined compound" or an

isomeric mixture of the same organic compound, put up in a way allowed under Chapter 29, Note 1. *See*, Chapter 29, Note 1. Products meeting these criteria remain versatile enough for use across their typical range of general applications, whether it be in making foodstuffs, pharmaceutical products, nutraceutical products, animal feed additives, cosmetics or other end use preparations. If the stabilizer contains ingredients that do not go toward stabilizating the vitamin or provitamin but rather are ingredients needed by a specific end use application, then the vitamin or provitamin can no longer be classified as a formulated vitamin or provitamin in heading 2936 but now must be classified as the specific use preparation it has become. Absent that, the product remains classifiable under heading 2936 as a vitamin or provitamin.

The *Roche Vitamin III* court recognized this by focusing on the role of the stabilizer ingredients in BetaTab and the absence of any tableting ingredients needed by tablet manufacturers to make it particularly suitable for a specific use in tablets. *Roche Vitamins III* at 732. The lack of tablet excipients meant that the ingredients used to create BetaTab's stabilizing matrix were not establishing or defining the product for a

particular tablet end use, notwithstanding that BetaTab had been designed and marked for use in tablets. *Id*. In its stabilized form, it remained suitable for other provitamin A applications. If BetaTab contained tableting excipients or other ingredients needed for tableting, then those ingredients would have exceeded the limitations set by heading 2936 and Chapter 29, Note 1(f). It would have become a preparation or a mixture of a tablet rather than a stabilized provitamin. Instead, the Federal Circuit in *Roche Vitamins III* found that the stabilizing ingredients complied with the heading and note by stabilizing the beta carotene for preservation or transport purposes and did not render it particularly suitable in a tablet because none of those ingredients were tablet excipients.

The classification of Betatene must follow the same path. Betatene meets the *eo nomine* language set out in heading 2936 and Chapter 29, Note 1(f) because the undisputed facts establish it consists of a natural provitamin dissolved in a solvent and stabilized for preservation and transport in accordance with that note. Appx003, Appx014, Appx358, Appx360, Appx361, Appx367, Appx987, Appx988, Appx991. It does not

have more stabilizer than necessary for preservation or transport. Appx013-014. The ingredients that make up the stabilizer and the manufacturing process do not alter the character of the beta carotene in Betatene. Appx015-016. Betatene is not a specific use product because the stabilizing ingredients and processing only function to create the stabilizing matrix for the beta carotene in the Betatene and are not, nor do they function as, tablet excipients required by tablet manufacturers to make tablets. Appx369, Appx993. Betatene's stabilizing ingredients and processing, common to other formulated vitamins and provitamins including other beta carotene formulations used for different provitamin or colorant applications, do not restrict its general use function as a source of provitamin A in non-tablet applications. Its suitability for general use as provitamin A has not been impaired by the stabilizing ingredients or processing. Appx367, Appx368, Appx546, Appx547, Appx549, Appx593, Appx594, Appx614, Appx629, Appx991, Appx992.

Therefore, Betatene is covered by the *eo nomine* tariff language of heading 2936 and Chapter 29 Note 1, and satisfies the conditions set out in *EN* 29.36. BASF has established its *prima facie* case that Betatene is

classifiable under heading 2936, and specifically in subheading 2936.90.01. The trial court committed reversible error by holding otherwise.

## V.    Betatene is Excluded from Heading 2106 Because it is Classifiable in Heading 2936

The trial court held that Betatene was classified under heading 2106, which provides for "[f]ood preparations not elsewhere specified or included."   This heading, however, must yield to classification under heading 2936 as a matter of law because Betatene is "elsewhere specified or included" under that heading 2936.

Heading 2106 is a residual, catch-all provision.   It is a "basket" provision, applicable to goods "not elsewhere specified or included." As such, this provision is only appropriate where no tariff category covers the merchandise more specifically. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002); *EM Indus., Inc. v. United States*, 999 F. Supp. 1473, 1480 (1998). In fact, the subheading advocated by the United States, subheading 2106.90.99, is the broadest of catch-all, basket,

residual provisions, capturing "[f]ood preparations not elsewhere specified or included: [o]ther: [o]ther."

But Betatene fits within the tariff language of "[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent . . .," and which satisfies the requirement of Chapter 29, Note 1. It is "elsewhere specified or included" under Heading 2936 and thus excluded from Heading 2106. *Rollerblade, Inc.,* 282 F.3d at 1354.

In its condition as imported, Betatene is not a dietary supplement or a food supplement but rather a formulated provitamin, stabilized for preservation or transport. *See, Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (goods are classified in their condition as imported and not in a post-importation condition). As the *ENs* to Heading 21.06 recognize, "16) Preparations, often referred to as food supplements or dietary supplements, consisting of, or based on, **one or more vitamins**, minerals, amino acids, concentrates, extracts, isolates or the like . . ." (emphasis added). Thus, *EN 21.06* recognize vitamins as a different article of commerce from that of a food supplement or dietary supplement classifiable under heading 2106. This is another reason to

reject defendant's classification under the residual, catch-all heading 2106 as an other food preparation, and instead classify it as a provitamin under the *eo nomine* tariff heading for provitamins, heading 2936.

## CONCLUSION

This Court should reverse the CIT's decision denying BASF's motion for summary judgment and granting the United States' summary judgment motion. The Court should hold that the imported product -- Betatene® 7.5% N – be classified under subheading 2936.90.01, HTSUS, and order CBP to reliquidate the subject entries with that classification and to refund the excess duties paid by BASF, with interest as provided for by law.

Respectfully submitted,

/s/Frederic D. Van Arnam, Jr.

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
45 Broadway, Suite 3130
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email: rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*

Dated: January 14, 2026
New York, NY

# Addendum

# TABLE OF CONTENTS TO ADDENDUM

**Description**                                    **AddendumPage**

*BASF Corp. v. United States*
Opinion and Order
Slip Op. 25-205
Filed August 13, 2025……………………………………….Appx1-022

Slip Op. 25-105

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BASF CORPORATION,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>      Defendant. | Before: Lisa W. Wang, Judge<br><br>Consol. Court No. 12-00422<br><br>**PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Denying Plaintiff's motion for summary judgment and granting Defendant's cross motion for summary judgment.]

Dated: August 13, 2025

<u>Frederic D. Van Arnam, Jr.</u>, Barnes, Richardson & Colburn, LLP, of New York, NY, for Plaintiff BASF Corporation. With him on the brief was <u>Ashley J. Bodden</u>.

<u>Luke Mathers</u>, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of New York, NY, for Defendant United States. With him on the brief were <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Justin R. Miller</u>, Attorney-In-Charge. Of Counsel on the brief was <u>Michael A. Anderson</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Wang, Judge: Before the court are cross motions for summary judgment. Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 70; Def.'s Cross Mot. for Summ. J. and Resp. in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Cross Mot."), ECF No. 75. BASF Corporation ("Plaintiff") challenges U.S. Customs and Border Protection's ("Customs") classification of Betatene® 7.5% N ("Betatene" or "imported merchandise") under subheading 2106.90.99 of the Harmonized Tariff Schedule of the United States ("HTSUS"), arguing that the proper classification of Betatene is subheading 2936.90.01. Pl.'s Mot. at 1. The

**PUBLIC VERSION**

United States ("Defendant") cross moves for summary judgment, arguing that Betatene

is properly classified under subheading 2106.90.99. Def.'s Cross Mot. at 2.

For the following reasons, Plaintiff's motion for summary judgment is denied and

Defendant's cross motion for summary judgment is granted.

## BACKGROUND

### I.    Procedural Background

Plaintiff was the importer of record for Betatene in entry number W66-0052750-2

on March 8, 2011, entry number 916-2183637-7 on June 2, 2011, entry number W66-

0054301-2 on December 9, 2011, and entry number W66-0054977-9 on January 28,

2012. Summons, ECF No. 1; see also Summons, ECF No. 1, Court No. 13-00109.

Customs liquidated the imported merchandise under subheading 2106.90.99. Pl.'s

Statement of Undisputed Material Facts ("Pl.'s SUMF") ¶ 6, ECF No. 71. Plaintiff timely

filed protests concerning Betatene on July 24, 2012, August 14, 2012, February 12,

2013, and February 21, 2013. Summons, ECF No. 1; see also Summons, ECF No. 1,

Court No. 13-00109. Customs denied the protests on August 13, 2012, August 16,

2012, and March 4, 2013. Summons, ECF No. 1; see also Summons, ECF No. 1, Court

No. 13-00109.

On December 27, 2012, Plaintiff commenced this action. Summons, ECF No. 1.

On March 19, 2013, Plaintiff commenced a second action in this court. Summons, ECF

No. 1, Court No. 13-00109. These cases were consolidated on February 7, 2022. ECF

No. 29. Plaintiff filed its consolidated complaint on March 7, 2022, requesting that the

court order: (1) reliquidation of the imported merchandise under HTSUS subheading

2936.90.01; and (2) a refund of excess duties paid, with interest. Consol. Compl., ECF

No. 33.

## II.    Description of the Imported Merchandise

Betatene "is a beta-carotene formulation consisting of beta-carotene carotenoid mixture." Pl.'s SUMF ¶ 7; see also Def.'s Resp. to Pl.'s Statement of Additional Undisputed Material Facts ("Def.'s Resp. to Pl.'s SUMF") ¶ 7, ECF No. 75-1. Beta-carotene is both a carotenoid and a form of provitamin A, and "is the active ingredient in [Betatene]." Pl.'s SUMF ¶¶ 8–9, 14. Beta-carotene "is unstable and prone to oxidative degradation and decomposition and is potentially pyrogenic if exposed to oxygen." Id. ¶ 16. Oxidization makes beta-carotene "ineffective for use as provitamin A or as a colorant." Id. ¶ 17. Thus, beta-carotene must "be stabilized to be used commercially as a provitamin or to color," and one way to do so "is to process it with [ ] other inert ingredients." Id. ¶¶ 18–19.

The beta-carotene in Betatene is "derived from the alga Dunaliella salina, dissolved in soybean oil and enrobed in a protective matrix of gelatin and sucrose, with ascorbyl palmitate and tocopherols as antioxidants, and with silicon dioxide as an anti-caking agent and flow aid." Id. ¶ 7. The alga Dunaliella salina is "grown in open air, saltwater lagoons in Australia using sunlight and consuming carbon dioxide," and is "then harvested from the lagoons, and the beta-carotene is extracted." Id. ¶¶ 24–25. Thereafter, "[i]n Australia, the beta-carotene is [ ] dissolved in soybean oil, resulting in a concentrated oily dispersion consisting of approximately 30 percent beta-carotene particles and 70 percent oil." Id. ¶ 26. The soybean oil is a solvent which "functions as a carrier for the beta-carotene particles from this point on, through the formulation of the imported merchandise, and through digestion by the human body." Id. ¶ 27. The soybean oil "protects and preserves" the beta-carotene "from oxygen exposure during the transportation and formulation steps," while also rendering beta-carotene

"bioavailable to humans as provitamin A or for use to impart color to foodstuffs." Id. ¶¶ 28–29.

    After this process concludes in Australia, the imported merchandise "is shipped from Australia to Japan to be microencapsulated." Def.'s Statement of Additional Undisputed Material Facts ("Def.'s SUMF") ¶ 6, ECF No. 75-2. Specifically, "the beta-carotene oily dispersion is transported to a tolling facility in Japan where it is formulated into microspheres, also known as beadlets." Pl.'s SUMF ¶ 30. The microencapsulation process involves the introduction of mixed tocopherols "into the soybean oil/beta carotene suspension," which "function to help stabilize the beta-carotene by preventing it from oxidizing." Id. ¶ 31. The mixture is then heated and, "[a]t the same time, in a second phase using heat and shear force, [ ] gelatin is dissolved with sucrose and the antioxidant ascorbyl palmitate in water." Id. ¶¶ 31–32. Both the "ascorbyl palmitate and mixed tocopherols stabilize the beta-carotene by preventing it from oxidizing." Id. ¶ 39.

    Thereafter, a homogenization phase combines the two phases to "creat[e] an emulsion of all the ingredients." Id. ¶ 33. This "emulsion is then sprayed into a spray cooler tower," which "results in the creation of liquid microspheres, or droplets, of the emulsion, with each microsphere containing a proportional amount of the ingredient." Id. ¶ 34. The droplets then thaw and are "dried using fluidized bed dryers," where "[a]ir flow and temperature are controlled to dry the individual droplets, and to cause the gelatin and sucrose in each droplet to combine into solid beadlets measuring 240–300 micrometers in width." Id. ¶ 35. The "[s]ucrose and gelatin harden to create a protective matrix that embeds the oily beta-carotene and antioxidant droplets." Id. ¶ 36. Also introduced during the drying phase is silicon dioxide, which "functions as an anti-caking

agent and flow aid, keeping the individual beadlets from agglomerating to each other or sticking to production equipment." Id. ¶ 40.

The process of microencapsulation is "expensive," and "provides stabilization, emulsification, and 'mechanical strength' for tableting." Def.'s SUMF ¶¶ 15, 20. Betatene's gelatin-sucrose matrix "prevent[s] beadlet cracking due to external stresses" caused by "direct compression on tableting machines." Id. ¶ 24. The finished product—Betatene after microencapsulation—"is guaranteed to contain at least 7.5 [percent] beta-carotene by weight." Id. ¶ 7. As such, Betatene "has been produced as a free-flowing red powder of individual, micron-sized beadlets containing beta-carotene particles," and "[e]ach beadlet consists of millions of droplets of beta-carotene dissolved in the soybean oil." Pl.'s SUMF ¶¶ 42, 44. Betatene is formulated and marketed by Plaintiff for use as a provitamin A source in vitamin and dietary supplement tablets and hard capsules. Id. ¶ 47.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction over this action. 28 U.S.C. § 1581(a) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.").

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." CIT R. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Specifically, "[i]n a tariff classification dispute, summary judgment is appropriate only when 'there is no genuine dispute as to the nature of the merchandise and the

classification determination turns on the proper meaning and scope of the relevant tariff

provisions.'" <u>Second Nature Designs Ltd. v. United States</u>, 660 F. Supp. 3d 1352, 1373

(CIT 2023) (quoting <u>Deckers Outdoor Corp. v. United States</u>, 714 F.3d 1363, 1371 (Fed.

Cir. 2013)); <u>Tyco Fire Prods. L.P. v. United States</u>, 918 F. Supp. 2d 1334, 1339 (CIT

2013) (quoting <u>Bausch & Lomb, Inc. v. United States</u>, 148 F.3d 1363, 1365 (Fed. Cir.

1998)) ("Where tariff classification is at issue, 'summary judgment is appropriate when

there is no genuine dispute as to the underlying factual issue of exactly what the

merchandise is.'").

Faced with cross motions for summary judgment, the court will "evaluate each

party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration." <u>Second Nature

Designs</u>, 660 F. Supp. 3d at 1381 (quoting <u>Mingus Constructors, Inc. v. United States</u>,

812 F.2d 1387, 1391 (Fed. Cir. 1987)); <u>see also</u> <u>Plexus Corp. v. United States</u>, 489 F.

Supp. 3d 1379, 1388 (CIT 2020) (quoting <u>Am. Fiber & Finishing, Inc. v. United States</u>,

121 F. Supp. 3d 1273, 1279 (CIT 2015) ("[E]ach party carries the burden on its own

motion to show entitlement to judgment as a matter of law after demonstrating the

absence of any genuine disputes over material facts.").

### I.      Judicial Review in Tariff Classification Cases

The court must "reach a correct result" in a tariff classification dispute. <u>Jarvis

Clark Co. v. United States</u>, 733 F.2d 873, 878 (Fed. Cir. 1984). The court "must

consider whether the government's classification is correct, both independently and in

comparison with the importer's alternative." <u>Id</u>. The plaintiff bears the burden of

establishing that Customs' classification of the imported merchandise was incorrect:

> Specifically, the importer must produce evidence (the burden of production portion of the burden of proof) that demonstrates by a preponderance (the burden of persuasion portion of the burden of proof) that Customs' classification decision is incorrect. The presumption of correctness certainly carries force on any factual components of a classification decision, such as whether the subject imports fall within the scope of the tariff provision, because <u>facts</u> must be proven via <u>evidence</u>.

<u>Universal Elecs., Inc. v. United States</u>, 112 F.3d 488, 492 (Fed. Cir. 1997) (emphases in original); <u>see also</u> <u>Jarvis Clark</u>, 733 F.2d at 878.

Once the plaintiff has met its burden, the court undertakes a two-step process to ascertain the correct result. <u>Faus Group, Inc. v. United States</u>, 581 F.3d 1369, 1371 (Fed. Cir. 2009). As the United States Court of Appeals for the Federal Circuit recently explained:

> Tariff classification under the HTSUS is a two-step process: first, the proper meanings of the terms of the tariff provisions are ascertained, and second, whether the subject merchandise comes within the description of those terms is determined. The proper meaning of the tariff provisions is a question of law, and the determination of whether the subject imports properly fall within the scope of the possible headings is a question of fact….

<u>Nature's Touch Frozen Foods (W) Inc., v. United States</u>, No. 2023-2093, 2025 WL 1354992, at *2 (Fed. Cir. May 9, 2025) (citation omitted); <u>Well Luck Co. v. United States</u>, 887 F.3d 1106, 1110 (Fed. Cir. 2018).

Where "there is no factual dispute regarding the merchandise, its structure and use, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions." <u>Faus Group</u>, 581 F.3d at 1372. The General Rules of Interpretation ("GRIs") "govern the classification of goods within the HTSUS." <u>Well Luck Co.</u>, 887 F.3d at 1111. In order "[t]o determine the meaning of an HTSUS provision, the court applies the GRIs in numerical order, beginning with GRI 1 and reaching subsequent GRIs if analysis under the preceding

GRI does not yield proper classification of the subject merchandise." <u>Amcor Flexibles</u>

<u>Kreuzlingen AG v. United States</u>, 560 F. Supp. 3d 1326, 1330 (CIT 2022). Under GRI 1,

"classification shall be determined according to the terms of the headings and any

relative section or chapter notes." GRI 1; <u>see also</u> <u>Orlando Food Corp. v. United States</u>,

140 F.3d 1437, 1440 (Fed. Cir. 1998).

HTSUS terms "shall be considered to be statutory provisions of law for all

purposes." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §

1204(c)(1), 102 Stat. 1107, 1149; <u>Libas, Ltd. v. United States</u>, 193 F.3d 1361, 1364

(Fed. Cir. 1999) ("[The] HTSUS is indeed a statute but is not published physically in the

United States Code."). When "a tariff term is not defined in either the HTSUS or its

legislative history, the term's correct meaning is its common or dictionary meaning in the

absence of evidence to the contrary." <u>Russell Stadelman & Co. v. United States</u>, 242

F.3d 1044, 1048 (Fed. Cir. 2001); <u>see also</u> <u>Carl Zeiss, Inc. v. United States</u>, 195 F.3d

1375, 1379 (Fed. Cir. 1999) ("Absent contrary legislative intent, HTSUS terms are to be

construed according to their common and commercial meanings, which are presumed

to be the same."). The court may interpret the terms of a tariff provision by "rely[ing]

upon its own understanding of the terms used and may consult lexicographic and

scientific authorities, dictionaries, and other reliable information sources." <u>Carl Zeiss,</u>

<u>Inc.</u>, 195 F.3d at 1379. The court may also consult Explanatory Notes ("ENs") published

by the World Customs Organization ("WCO") "[f]or additional guidance on the scope

and meaning of tariff headings and chapter and section notes." <u>DIS Vintage LLC v.</u>

<u>United States</u>, 456 F. Supp. 3d 1323, 1329 (CIT 2020). ENs are "not binding law," but

they are "generally indicative of the proper interpretation of a tariff provision." Id.

(quoting Agfa Corp. v. United States, 520 F.3d 1326, 1329 (Fed. Cir. 2008)).

## DISCUSSION

**I.      The Imported Merchandise Is Not Properly Classified Under Heading
         2936**

It is undisputed that the imported merchandise are individually

microencapsulated beadlets consisting of beta-carotene, soybean oil, gelatin, sucrose,

ascorbyl palmitate, tocopherols, and silicon dioxide. Pl.'s Mot. at 1–2; see also Pl.'s

SUMF ¶ 7. Such merchandise is one in a range of beta-carotene products produced by

Plaintiff and other manufacturers. BASF Slide Deck at 11–14, ECF No. 74-6; ECF No.

69-5 at 3–5. While beta-carotene products may vary in the amount of each component

ingredient and its production process, they are all generally used as colorants and

sources of provitamin A in food or dietary supplements. Pl.'s Mot. at 6; Def.'s Cross Mot.

at 1; see also Pl.'s SUMF ¶¶ 9, 11, 18–19; ECF No. 69-6 at 2.

Customs classified the imported merchandise under subheading 2106.90.99,

dutiable at 6.4 percent, ad valorem. Customs' classified heading is:

**2106 (HTSUS 2011 and 2012)**

                    Food preparations not elsewhere specified or included:

**2106.90**    Other:

**2106.90.99**    Other.

Def.'s Cross Mot. at 26.

Plaintiff contends that the imported merchandise is instead classifiable under

subheading 2936.90.01, which is duty free:

**2936 (HTSUS 2011 and 2012)**

Case 1:12-cv-00422-LWW    Document 83    Filed 09/05/25    Page 10 of 22

Consol. Court No. 12-00422                                            Page 10
**PUBLIC VERSION**

>         Provitamins and vitamins, natural or reproduced by synthesis
>         (including natural concentrates), derivatives thereof used
>         primarily as vitamins, and intermixtures of the foregoing,
>         whether or not in any solvent:

> **2936.90.01**    Other, including provitamins and natural concentrates.

Pl.'s Mot. at 3–4.

GRI 1 requires that classification be determined in the first instance "according to the terms of the headings and any relative section or chapter notes." For a beta-carotene product to be classifiable under heading 2106, it must "not [be] elsewhere specified or included." Because Plaintiff bears the burden of establishing that Customs' classification of the imported merchandise is incorrect, the court must determine whether Plaintiff has met its burden of showing that the merchandise is classifiable under chapter 29. See Universal Elecs., 112 F.3d at 492; see also Jarvis Clark, 733 F.2d at 876.

Faced with a tariff classification dispute as a matter of law, the court must determine the proper meaning of the tariff provisions' terms, as well as whether the imported merchandise properly falls within the scope of the tariff provision. Well Luck Co., 887 F.3d at 1110. Where, as here, there is no dispute as to the meaning of the terms of heading 2936 and the nature of Betatene, the question before the court is whether Betatene falls within the scope of heading 2936. See Second Nature Designs, 660 F. Supp. 3d at 1373.

This court and the Federal Circuit have previously examined the proper classification of a beta-carotene product under headings 2106, 2936, and 3204. See Roche Vitamins, Inc. v. United States ("Roche I"), 750 F. Supp. 2d 1367 (CIT 2010); Roche Vitamins, Inc. v. United States ("Roche II"), 922 F. Supp. 2d 1353 (CIT 2013);

Case 1:12-cv-00422-LWW   Document 83   Filed 09/05/25   Page 11 of 22

Consol. Court No. 12-00422                                        Page 11
**PUBLIC VERSION**

Roche Vitamins, Inc. v. United States ("Roche III"), 772 F.3d 728 (Fed. Cir. 2014).

Specifically, in Roche III, the Federal Circuit reviewed the classification of "BetaTab,"

another provitamin A product made using beta-carotene and other ingredients. 772 F.3d

728. Beta-carotene comprises twenty percent of BetaTab, with the remainder consisting

of "antioxidants, gelatin, sucrose, and corn starch." Id. at 729. The beta-carotene in

BetaTab "is an organic colorant with provitamin A activity," and BetaTab "can be used

as a source of Vitamin A in foods, beverages, and vitamin products." Id.

    The Federal Circuit found that BetaTab was properly classified as a provitamin

under heading 2936 because the product "fulfills the description in the statutory heading

[of heading 2936] and satisfies the limitations of both Note 1 to Chapter 29 and

Explanatory Note 29.36." Roche III, 772 F.3d at 732.[1] In relevant part, note 1 to chapter

29 provides that "[e]xcept where the context otherwise requires, the headings of this

Chapter apply only to: … (f) [t]he products mentioned in (a), (b), (c), (d) or (e) above

with an added stabilizer (including an anticaking agent) necessary for their preservation

or transport." HTSUS Ch. 29, n.1 (2012).

    Explanatory notes are not legally binding, but "may be consulted for guidance

and are generally indicative of the proper interpretation of a tariff provision." Roche III,

772 F.3d at 731 (citing Motorola, Inc. v. United States, 436 F.3d 1357, 1361 (Fed. Cir.

2006)). In Roche III, the Federal Circuit found that "[t]he Explanatory Notes for HTSUS

Chapter 29 provide further insight as to the proper classification of merchandise under

_____

[1] Although the Federal Circuit's ruling relied on the 2002 editions of the HTSUS and
explanatory notes, the implicated headings and explanatory notes are substantively the
same in relevant part to the 2011 and 2012 editions, which are the bases of this
proceeding.

heading 2936." Id. (citing EN 29.36 (3d ed. 2002)). Specifically, the Federal Circuit

examined the limitations provided for in EN 29.36:

> Explanatory Note 29.36 expands on Note 1(f) to Chapter 29 and permits the
> addition of stabilizer ingredients if the addition or processing does not (1)
> alter the character of the basic product and (2) render it particularly suitable
> for specific use rather than for general use.

Id. at 732.

The Federal Circuit went on to examine the characteristics of BetaTab under

these two limitations, finding that: (1) the ingredients and plaintiff's "manufacturing

process does not change BetaTab's functionality as provitamin A or change the

character of the beta-carotene as provitamin A"; and (2) the addition of stabilizer

ingredients did not render the basic product, beta-carotene, particularly suitable for

specific use rather than for general use. Id.

In making its conclusion, the Federal Circuit expressly noted that "[a]lthough the

high concentration and high bioavailability of beta-carotene in BetaTab make it

preferable for use for the manufacture of tablets, no evidence supports the assertion

that the added stabilizers make BetaTab particularly suitable for tableting." Id. at 732–

733 (emphases added).

The Federal Circuit's analysis in Roche III is instructive. Betatene, like BetaTab,

is a beta-carotene product containing gelatin and sucrose. ECF No. 69-6 at 2. Both

products "must first be combined with other ingredients" to be used as provitamin A.

Roche III, 772 F.3d at 729; see also Pl.'s SUMF ¶¶ 18–19. As such, the proper

classification of Betatene turns on whether it satisfies the limitations of note 1(f) to

chapter 29 and EN 29.36, i.e., to be classifiable as a provitamin under heading 2936:

Case 1:12-cv-00422-LWW    Document 83    Filed 09/05/25    Page 13 of 22

Consol. Court No. 12-00422                                                    Page 13
PUBLIC VERSION

1. Betatene must not have more stabilizers than necessary for preservation or transport;
2. The addition of stabilizer ingredients and the manufacturing process must not alter the character of Betatene as a beta-carotene product; and
3. The addition of stabilizer ingredients and the manufacturing process must not render Betatene particularly suitable for specific use rather than for general use.

See id. at 731. The court considers each limitation in turn.

### A.     The stabilizing ingredients in Betatene are not in quantities greater than necessary for preservation or transport.

The first issue is whether the stabilizing ingredients in Betatene are in quantities greater than necessary for preservation or transport. The Federal Circuit has explained that "Note 1(f) to Chapter 29 permits the addition of stabilizer ingredients to BetaTab, as long as the amount of stabilizer added is not more than necessary for preservation or transport." Roche III, 772 F.3d at 732.

Both parties agree that stabilization is necessary for a beta-carotene product to be commercially viable, regardless of the amount of beta-carotene in the formulation. Pl.'s SUMF ¶¶ 16–18; Def.'s Resp. to Pl.'s SUMF ¶¶ 16–18. As to Betatene, Plaintiff argues that "the ingredients that make up the stabilizing matrix were determined empirically to be only that amount necessary to stabilize the beta-carotene for preservation or transport." Pl.'s Resp. in Opp. to Def.'s Cross Mot. for Summ. J. and Reply in Supp. of its Mot. for Summ. J. at 31, ECF No. 78. Defendant argues that "the quantity of [stabilizing ingredients] added to Betatene cannot be 'necessary' for

'preservation or transport' because beta-carotene is preservable and transportable with less." Def.'s Reply in Supp. of its Cross Mot. for Summ. J. ("Def.'s Reply") at 9, ECF No. 79.

Evidence provided by Plaintiff's experts establishes that Betatene is formulated using the minimum quantity of stabilizing ingredients necessary for preservation or transport. Plaintiff's expert, Dr. Marc Meyers, explained that "when formulating [Betatene], [Plaintiff] has cost considerations and uses no more [inert ingredients] than [ ] necessary to make a stable formulation." Expert Rep. of Dr. Marc Meyers ("Meyers Exp. Rep.") at 11, ECF No. 71-11; see also Dep. of Dr. Christian Köpsel ("Köpsel Dep.") at 105:12–17, ECF No. 74-3.

Defendant provides no evidence to refute Plaintiff's evidence. Instead, Defendant compares Betatene to other beta-carotene products with varying quantities of stabilizing ingredients, including the one at issue in Roche III. Def.'s Cross Mot. at 17–18. Defendant argues that "[i]t cannot be the case … that formulations ranging from 1 to 7.5 to 10 to 20 to 30 percent beta-carotene by weight all contain no more additives than necessary for beta-carotene's stabilization." Id. at 18.

Such speculation is insufficient to establish that the stabilizing ingredients added to Betatene exist in quantities greater than necessary for stabilization or transport. As such, the court finds that the quantities of stabilizing ingredients added to Betatene satisfy the limitations explained in note 1(f) to chapter 29. See Roche III, 772 F.3d at 732.

Case 1:12-cv-00422-LWW    Document 83    Filed 09/05/25    Page 15 of 22

Consol. Court No. 12-00422                                                    Page 15
PUBLIC VERSION

B.    **The addition of stabilizer ingredients and Betatene's manufacturing process do not alter the character or functionality of Betatene as provitamin A.**

The Federal Circuit in <u>Roche III</u> considered whether BetaTab was changed in character or functionality as provitamin A. <u>Id</u>. Here, Plaintiff argues that "the stabilizing ingredients in Betatene do not alter the character of the beta-carotene," and that "Betatene's formulation does not chemically modify, physically change or otherwise alter the beta-carotene particles or their inherent ability to be provitamin or to color." Pl.'s Mot. at 60. Defendant argues instead that "the test is whether the additives give the formulation different characteristics that render the product 'particularly suitable for specific use rather than for general use.'" Def.'s Reply at 4–5 (quoting <u>Roche III</u>, 772 F.3d at 732).

In <u>Roche III</u>, the Federal Circuit held that EN 29.36 "expands on Note 1(f) to Chapter 29 and permits the addition of stabilizer ingredients if the addition or processing does not … alter the character of the basic product." 772 F.3d at 732; <u>see also</u> EN 29.36. In making its determination, the Federal Circuit explained that:

> The government's expert testified, and the Court of International Trade found, that [the plaintiff's] manufacturing process does not change BetaTab's functionality as provitamin A or change the character of the beta-carotene as provitamin A.

<u>Roche III</u>, 772 F.3d at 732.

Here, the parties agree that "[n]othing in [Betatene's] formulation changes the beta-carotene's inherent character as a source of provitamin A." Pl.'s SUMF ¶ 46; Def.'s Resp. to Pl.'s SUMF ¶ 46. This is further supported by the record evidence and testimony of the parties' experts. Defendant's expert, Dr. Stuart Cantor, explained that

Case 1:12-cv-00422-LWW    Document 83    Filed 09/05/25    Page 16 of 22

Consol. Court No. 12-00422                                                    Page 16
**PUBLIC VERSION**

the beta-carotene in Betatene "was not chemically modified" and "will remain a source

of vitamin A." Dep. of Dr. Stuart Cantor ("Cantor Dep.") at 135:15–22, ECF No. 74-11.

Dr. Meyers, Plaintiff's expert, explained that "no physical or chemical changes [ ] are

occurring to the beta-carotene." Dep. of Dr. Marc Meyers ("Meyers Dep.") at 111:21–

112:12, ECF No. 75-8. Plaintiff's expert, Dr. Christian Köpsel, further explained that

Betatene "will function as a provitamin A source." Köpsel Dep. at 103:10–16.

    The addition of stabilizer ingredients and Betatene's manufacturing process

satisfy the first limitation of EN 29.36 and do not alter the character of the beta-carotene

or Betatene's ability to function as provitamin A.

### C.    Betatene is particularly suitable for tableting.

    The next issue is whether the addition of stabilizer ingredients and the

manufacturing process render Betatene particularly suitable for specific use rather than

for general use. Plaintiff argues that "the composition of Betatene … does not

specifically prepare it for tableting." Pl.'s Mot. at 47. Defendant argues that Betatene's

processing makes it "particularly suitable for use in dietary supplements." Def.'s Cross

Mot. at 19.

    The Federal Circuit explained that "Explanatory Note 29.36 expands on Note 1(f)

to Chapter 29 and permits the addition of stabilizer ingredients if the addition or

processing does not … render it particularly suitable for specific use rather than for

general use."[2] Roche III, 772 F.3d at 732. Addressing BetaTab's suitability for tableting,

the Federal Circuit found that:

––––––––––––––––––––

[2] The Federal Circuit found that the court relied on an "overly-narrow interpretation" of
EN 29.36 in concluding that "[a]dded ingredients that make a chemical highly capable of
a use that is not an ordinary use of chemicals of the heading … will render the item

**PUBLIC VERSION**

> Expert testimony established that the sucrose and gelatin additives function as stabilizers and do not "specifically prepare [BetaTab] for tableting." In addition, the record demonstrates that BetaTab has no ingredients added specifically for tableting, such as tableting excipients. The stabilizers used in BetaTab were essentially the same as those used to stabilize other vitamins and other beta-carotene products that were marketed for use as colorants. Although the high concentration and high bioavailability of beta-carotene in BetaTab make it preferable for use for the manufacture of tablets, no evidence supports the assertion that the added stabilizers make BetaTab particularly suitable for tableting. As a result, the Court of International Trade did not clearly err in finding that the addition of stabilizer ingredients did not render BetaTab particularly suitable for the specific use of tableting.

Id. at 732–33 (citations omitted) (emphasis added). The court must therefore determine whether Betatene's additives or processing "specifically prepare" it for tableting and render it "particularly suitable" for a specific use. See id.

Based on the record, the process of "microencapsulation" for Betatene makes it particularly suitable for tableting in a manner which is distinguishable from the product in Roche III, BetaTab. Betatene is formulated from a 30 percent beta-carotene and 70 percent soybean oil dispersion, which "is shipped from Australia to Japan to be microencapsulated." Def.'s SUMF ¶¶ 3, 6; Pl.'s SUMF ¶¶ 26, 30.[3] During the microencapsulation process, Betatene is "enrobed in a protective matrix of gelatin and sucrose," which "embeds the oily beta-carotene and antioxidant droplets" and "combine[s] [them] into solid beadlets." Pl.'s SUMF ¶¶ 7, 35, 36. Gelatin and sucrose

---

'particularly suitable for specific use rather than for general use.'" Roche III, 772 F.2d at 733 (emphasis omitted) (quoting Roche II, 922 F. Supp. 2d at 1359).

[3] The product of a 30 percent beta-carotene and 70 percent soybean oil dispersion mix is not specifically suitable for tableting and is instead marketed as a colorant. See Def.'s SUMF ¶ 5 ("[Plaintiff] markets '30% Natural Beta-Carotene in soybean oil' as a colorant for food products.").

"function[ ] together to plasticize[ ] the matrix." Id. ¶ 37.

Plaintiff's expert, Dr. Meyers, testified that microencapsulation "costs money[,] so you are not going to want to just do it." Meyers Dep. at 62:2–5. A formulator will instead "want to do [microencapsulation] for a purpose." Id. at 63:2–4. Dr. Köpsel testified that "[t]ablet formulation[s] … are designed for having a high stability and they can be applied in tablets." Köpsel Dep. at 30:2–5. Dr. Meyers further testified that the main purpose for microencapsulation is mechanical strength for direct compression or tableting. See Meyers Dep. at 72:22–73:8. To this point, the parties agree that Betatene's microencapsulation "provides [the] desired flexibility and durability in tablet compression for end-use applications." Def.'s SUMF ¶ 25.

Defendant's expert, Dr. Cantor, explained in his expert report that Betatene "was designed specifically to survive the shear forces encountered during direct compression tableting, and is intended to be used specifically for that application." Expert Rep. of Dr. Stuart Cantor ("Cantor Exp. Rep.") at 7, ECF No. 75-10. Dr. Cantor explained that Betatene's "plasticized gelatin shell … helps protect the solubilized oil-based carotenoids inside from leaking out during the high shear-force direct-compression tableting process." Id. at 8.

Plaintiff's expert, Dr. Meyer similarly explained in his expert report that Betatene's "formulation has been optimized … for use in dietary supplements … because it provides mechanical stability to the beadlet during direct compression tablet manufacturing." Meyers Exp. Rep. at 11. Plaintiff's expert Dr. Köpsel explained that Betatene has a "particular kind of beadlet," which is "specifically going to be used to make a tablet or a hard capsule or something along those lines." Köpsel Dep. at

Case 1:12-cv-00422-LWW    Document 83    Filed 09/05/25    Page 19 of 22

Consol. Court No. 12-00422                                                        Page 19
**PUBLIC VERSION**

57:16–22. Evidence on the record demonstrates that Betatene's microencapsulation

specifically provides the mechanical strength necessary for Betatene to be used in

tablets.

Further, Betatene is marketed and optimized for tablets. Plaintiff does not dispute

that Betatene is "formulated and marketed … for use as a provitamin A in vitamin and

dietary supplement tablets and hard capsules." Pl.'s SUMF ¶ 47. Plaintiff's expert, Dr.

Köpsel, testified that "the main purpose [of Betatene] is tableting indications." Köpsel

Dep. at 57:3–4. Plaintiff's own marketing materials state that Betatene is used as a

"[d]irect compressible," with "[e]xcellent stability in tablets." BASF Slide Deck at 12–13,

ECF No. 74-6. Plaintiff's product datasheet further states that Betatene's "high

concentration powder withstands the pressure of compression while retaining

carotenoid stability." Betatene Product Datasheet at 3, ECF No. 75-7.

The record demonstrates that the processing and ingredients incorporated into

Betatene, particularly the process of microencapsulation, renders Betatene particularly

suitable for the specific use of tableting.

### D.    Betatene is not suitable for general use.

The final issue is whether Betatene remains suitable for general use. The

Federal Circuit in Roche III found that BetaTab was "suitable for general use" because it

could "be used as a source of vitamin A in foods, beverages, and vitamin products." 772

F.3d at 732–33; see also W.R. Filbin & Co. v. United States, 744 F. Supp. 289, 291 (CIT

1990), aff'd, 945 F.2d 390 (Fed. Cir. 1991) (citation omitted) ("'Suitable for use' as

applied in the Customs law means 'actually, practically, and commercially fit' for such

use."). In making its determination in Roche III, the Federal Circuit relied on the record

Case 1:12-cv-00422-LWW    Document 83    Filed 09/05/25    Page 20 of 22

Consol. Court No. 12-00422                                                    Page 20
PUBLIC VERSION

and "[e]xpert testimony [that] established that BetaTab is 'well-suited for fortifying foods

with provitamin A.'" 772 F.3d at 732–33.

        Plaintiff argues that "Betatene is a general use source of provitamin A because it

can be used in a variety of applications if the user so desired." Pl.'s Mot. at 50.

Defendant argues that "the undisputed record evidence shows that Betatene is not

suitable for general use" because "[t]he same 'rigid gelatin shell' that renders Betatene

particularly suitable for use in dietary supplements renders it 'not suitable to be used' for

beta-carotene's remaining commercial uses." Def.'s Cross Mot. at 20.

        Here, record evidence establishes that Betatene is not suitable for general use

after microencapsulation. Betatene's suitability for uses other than tableting requires it

to be de-formulated from its microencapsulated beadlet, which is not commercially or

functionally viable. See Cantor Dep. at 115:15–116:10 (explaining that "[i]t wouldn't

make any sense to encapsulate a product … and add that" into food because "you're

going to bite into it" and this will cause the beadlet to rupture, leaking the oil inside and

leaving a "funny taste" for consumers)[4]; Meyers Dep. at 62:4, 89:14–17, 104:6–8

(explaining that "microencapsulation is expensive," and "[a]s soon as you crack [the

beadlet] you have lost the benefit of why you are forming a beadlet").[5] As such,

---

[4] Dr. Cantor also explained that "it wouldn't make sense" to use Betatene as a colorant
"[b]ecause if the company goes to the extent to put the costs in to encapsulate it, why
would they add it to hot water to get a colorant when you could just use an oil
dispersion? …. That's extra cost, that's extra personnel to do that." Cantor Dep. at
79:23–80:6, 126:23–24.

[5] In contrast, Plaintiff's 30 percent beta-carotene and soybean oil formulation, which is
Betatene prior to microencapsulation in Japan, is marketed for use as a colorant for
food products. Def.'s SUMF ¶ 5.

Betatene is not suitable for general use and it fails to satisfy the second limitation of EN

29.36. See Roche III, 772 F.3d at 732–33.

## II.    The Imported Merchandise Is Properly Classified Under Heading 2106

Plaintiff has not satisfied its burden of demonstrating that Betatene is classifiable

under heading 2936. As part of its duty to reach the correct result, however, the court

continues its analysis.[6] See Jarvis Clark, 733 F.2d at 878. Specifically, the court turns to

whether Betatene is classifiable under heading 2106.

Heading 2106 covers "[f]ood preparations not elsewhere specified or included."

To "fall under [this] heading … two criteria must be met: the product[ ] must be (1) a

food preparation, which is (2) not elsewhere specified or included." Roche II, 922 F.

Supp. 2d at 1357 (alterations in original) (quoting R.T. Foods, Inc. v. United States, 887

F. Supp. 2d 1351, 1358 (CIT 2012)). Here, the first criterion is satisfied. Betatene is

"food" because there is no dispute that it is a "substance that is intended to be

ingested," and it is a "preparation" because, as discussed above, evidence on the

record demonstrates that Betatene is "a substance specifically prepared, or made up for

its appropriate use or application." Mondelez Glob. LLC v. United States, 253 F. Supp.

3d 1329, 1332 (CIT 2017) (explaining that "food preparation" is "simply an attributive

noun" because "the word 'food' simply specifies what type of 'preparation' is covered by

heading 2106"); see also Pl.'s SUMF ¶¶ 7, 9–10, 14, 32. The second criterion is

---

[6] Plaintiff does not address the scope of heading 2106, arguing instead that Betatene is
"elsewhere specified or included" under heading 2936. Pl.'s Mot. at 20.

**PUBLIC VERSION**

satisfied because Betatene is not "elsewhere specified or included."[7] <u>Roche II</u>, 922 F.

Supp. 2d at 1357. Therefore, the court concludes that Customs' classification of

Betatene under heading 2106 was correct.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is **DENIED**

and Defendant's cross motion for summary judgment is **GRANTED**. Judgment shall be

entered accordingly.

/s/       Lisa W. Wang_____
Lisa W. Wang, Judge

Dated: <u>August 13, 2025</u>
     New York, New York

---

[7] The court concludes that no other heading classification is appropriate after independently considering other classifications. <u>See</u> <u>Jarvis Clark</u>, 733 F.2d at 878; <u>Trijicon</u>, 686 F. Supp. 3d at 1342 n.4.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations contained in Fed. R. App. R. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 12,020 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using the current version of Word offered in Microsoft 365, in 14-point Century Schoolbook.

/s/ Frederic D. Van Arnam, Jr.
Frederic D. Van Arnam, Jr.

**CERTIFICATE OF SERVICE**

I certify that on January 14, 2026, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF service.

/s/ Frederic D. Van Arnam, Jr.
Frederic D. Van Arnam, Jr.